## No. XV.

### EX PARTE COLIN DE BLAND.

(See Note 17.)

*Fort Bend County.*

TERRELL, JUSTICE.—This was a motion made by an attorney of the
District Court for the county of Fort Bend to dismiss all cases on the
docket of said court which had originated since the 19th day of August,
1839, and to adjourn the court until the next regular term. The grounds
in support of the motion are, that the clerk of the court was not elected
agreeably to the provisions of the Constitution and laws of the Republic,
but that he exercised the functions of the office by virtue of an appoint-
ment from the district judge. The first question for this court to decide,
and which controls the case, is whether we can take cognizance of the
case in the form in which it is brought before us. We are unanimously
of opinion that we can not.

The law relied upon in argument, as giving the court jurisdiction in
the case, is the third section of the act of Congress organizing the Supreme
Court, which says: "The said Supreme Court shall have jurisdiction
over, and shall hear and determine all manner of pleas, plaints, motions,
causes and controversies, civil and criminal, which may be brought before
it from any court in this Republic, either by appeal or other legal pro-
cess, and which shall be cognizable in the said Supreme Court, according
to the Constitution and laws of this Republic." The question here natu-
rally arises, has this case been brought here "according to the Constitu-
tion and laws of the Republic?" The "laws of the Republic" point out
the mode by which suits shall be brought in the different courts. This
court, possessing "appellate jurisdiction" only, can consequently take
cognizance of such cases only as are properly brought here from some
of the inferior courts. It therefore follows, as a necessary consequence,
that they must be brought into those inferior courts in the manner
pointed out by law; and if they are not so brought into the court below,
the defect can not be cured by an appeal to this court.

There are several methods known to the law by which causes may be
brought into the district court. The one generally adopted is by petition
and summons, and we do not say, if objection had been made to the writ
in any cause in the court, as having been issued by a clerk who had no

---

is discovered before defendant answers, a new writ may be awarded. If de-
fendant answers, he waives objections to process. Wescott v. Menard, Dal.,
503; Kavanaugh v. Brown, 1 T., 481; Cartwright v. Chabert, 3 T., 261; Wood v.

authority, the cause could not then properly have been brought here. Our statutes also authorize motions against officers of court in certain cases; but then the party is entitled to previous notice, that he may prepare for his defense. The most usual method perhaps of ascertaining whether an individual has authority to exercise the functions of an office is by an information in the nature of the ancient common law writ of quo warranto. None of these methods, nor any other pointed out by our statutes or known to the common law, having been pursued in this case, we can not take cognizance of it, but are compelled to declare the whole proceeding coram non judice, and consequently void. The case is therefore ordered to be stricken from the docket for want of jurisdiction.

*Dismissed.*

## No. XVI.

### REPUBLIC OF TEXAS v. THOMAS I. SMITH.

#### (See Note 18.)

---

Smith, 11 T., 367; Yturri v. McLeod, 26 T., 84; Herndon v. Crawford, 41 T., 267; Armstrong v. Bean, 59 T., 492; Rice v. Peteet, 66 T., 568; Cahill v. Ry., 76 T., 100.

**Note 12.**—Guest v. Guest, p. 394.

Court has no power to enter an involuntary nonsuit. Allcorn v. Sweeney, Dal., 494; Sandoval v. Rosser, 86 T., 682, 686. Appeal does not lie from judgment of nonsuit by a justice of the peace on ground that plaintiff failed to appear. Morgan v. Johnson, 4 T., 117.

cution, upon an indictment in the district court, the right of an appeal to the Supreme Court? We think that he has. We believe that such a right is in accordance with the genius and spirit of our institutions and secured to him by the Constitution and laws of this country. And it must, we think, be conceded by everyone that it is a question, whether considered with reference to the infancy of our jurisprudence yet to be perfected by subsequent adjudication and the wisdom of the Legislature, or the almost untried harmony of our institutions, political as well as judicial, which have as yet been but slightly explored and partially developed, or the sacred character of the rights to the citizens, as one involving the most grand and solemn considerations.

The word "appeal" comes from the civil law; and the nature and operation of an appeal, in a technical sense, can not be a subject of doubt in proceedings governed by that law. Indeed, it is sometimes used to denote the nature of appellate jurisdiction, without any regard to the particular mode by which a cause is transmitted from an inferior to a superior jurisdiction. In this sense it is used by Blackstone when he speaks of the Court of Exchequer as a court that hath no original jurisdiction. So also the same elegant writer denominates the House of Peers of England as the Supreme Court of the Empire. See 3 Black. Com., 56.

There are some other senses in which the word occurs in the common law, which we may pass over in silence, as they have no application to the present inquiry.

Appeal ("appellatio" in the civil law) is defined—"ab inferioris judicis sententia ad superiorem provicare"—the removal of a cause from the sentence of an inferior to a superior judge; or as Blackstone has expressed it, "a complaint to a superior court of injustice done by an inferior one." Calveus has collected the definitions given by many learned civilians, but they all resolve themselves in the above. See 3 Black. Com., 312; Calveus' Lexicon, "Appellatio;" Shepherd's Abridgement, "Appeal." Each of these definitions accurately states the meaning but not the mode or effect of an appeal.

The remedy by appeal—as known and practiced in England—is in a great -measure confined (for I speak not of appeals of death and of robbery, and of summary proceedings before magistrates) to courts of equity, admiralty, and ecclesiastical jurisdiction, in all of which no jury intervenes; and in each of those courts the judge is in general the sole arbiter both of the law and the facts, and the mode of proceeding is borrowed almost exclusively from the civil law.

---

**Note 13.**—Morton v. Gordon and Alley, p. 396.

Jurisdiction over person may be conferred by consent or by acts tantamount to consent. Green v. Hill, 4 T., 465; Campbell v. Wilson, 6 T., 379; Burnley v. Cook, 13 T., 566; Life Ins. Co. v. Ray, 50 T., 511; Galveston Co. v. Noble, 56 T., 575; Brooks v. Chatham, 57 T., 31; Glass v. Smith, 66 T., 548; Douglas v. Baker, 79 T., 499; Fairbanks v. Blum, 2 T. C. A., 479; United Workmen v. Stumpf, 24 T. C. A., 309; Osborne v. Barnett, 1 App. C., 125; Life Ins. Co. v. Fitzgerald, 1 App. C., sec. 1346. But jurisdiction over subject matter can not be conferred by consent. Wynns v. Underwood, 1 T., 48; Swigley v. Dickson, 2 T., 192; Foster v. McAdams, 9 T., 542; Burnley v. Cook, 13 T., 586; Life Ins. Co. v. Ray, 50 T., 511; Henderson v. Beaton, 52 T., 29;

And it is undoubtedly true that in courts proceeding according to the course of the civil law, an appeal from an inferior to a superior tribunal removes the whole proceedings, and usually, though not invariably, opens both the law and the facts for re-examination.  3 Dallas, 321; 5 Cranch, 281.

By the eighth section, fourth article of our Constitution, we find the Supreme Court of Texas clothed with appellate jurisdiction only, which shall be coextensive within the limits of the Republic; but neither in that section or elsewhere in the Constitution do we find its appellate jurisdiction restricted to any particular class or character of actions. We search in vain in that instrument for any such restriction.  It can not be found.  But on the contrary, in the Declaration of Rights, it is emphatically declared that all courts shall be open, and "every man for any injury done him in his lands, goods, person or reputation, shall have remedy by due course of law."  Dec. of Rights, sec. 11.

We think it clear then that the right of appeal from the district court to the Supreme Court in criminal prosecutions, as well as in civil actions, is secured to the defendant in such prosecution by the Constitution.  But if we were of opinion that any doubt could be entertained of the clear and indefeasible right to an appeal in criminal cases, by the Constitution (and indeed we have none, but rest it upon that instrument alone), that doubt would in a great measure be removed by the act entitled "An act to establish and organize the Supreme Court, and to define the powers and jurisdiction thereof."  In the third section of that act there is a legislative declaration of the right of appeal in criminal as well as civil cases:  "And the said Supreme Court shall have jurisdiction over and hear and determine all pleas, plaints, motions and controversies, civil and criminal, which may be brought before it."  And in the sixth section the same right of appeal is clearly and indisputably recognized in language which none can mistake, in the following words: "The sentence of the Supreme Court, in all criminal prosecutions brought before such court from any other courts, shall be executed in like manner in all respects as if such sentence had been rendered in the court wherein the prosecution originated; and the sheriff of the proper county shall be charged with the execution of such sentence."  Hence we see that immediately after the organization of our government, a legislative declaration of the constitutional right of appeal in criminal cases was made.  But it was contended by the district attorney for the Third Judicial District and by the Attorney-General, that if indeed the Supreme Court had jurisdiction of criminal cases and could hear and determine all manner of pleas, plaints, motions and controversies, civil

---

Smith v. Parks, 55 T., 82, 86; Watson v. Baker, 67 T., 48, 50; Griffin v. Brown, 1 App. C., sec. 1099; Haney v. Milikin, 2 App. C., sec. 223.  The principle of set-off is statutory and analogous to "compensation" in the civil law.  It is unknown to the common law and was engrafted into our law by Act of February 5, 1840 (Gammel's Laws of Texas, vol. 2, p. 236), to avoid multiplicity of suits.  Bates v. Republic, 2 T., 616; Thomas v. Hill, 3 T., 270; Holliman v.

and criminal, yet it could exercise that jurisdiction only by writ of error, and not by appeal; that the common law having been adopted by the Constitution in criminal proceedings became a part of that instrument, and by that law a cause was removed from an inferior to a superior tribunal by writ of error only and not by appeal; that by a writ of error, the errors of law alone could be examined in the Supreme Court, and that the usual effect of an appeal from an inferior tribunal being one that opened the facts as well as the law for re-examination, could not be admitted as a right to the defendant in the district court in a criminal prosecution, because no such right was ever known to the common law of England.

We frankly admit that we search in vain in the common law for an instance of an appellate court retrying the cause upon the facts; and we know that the only mode known to the common law of removing a cause from an inferior to a superior tribunal was by writ of error. But we can not admit that in adopting the common law, the Convention intended thereby to adopt irrevocably the practice of the common law in criminal proceedings, and tie down the Legislature of the country to the common law course of proceedings. For we see that the very framers of the Constitution itself, after adopting the "common law as the rule of decision in criminal proceedings," have gone on and made considerable innovations in the practice of that very code which they had just adopted. At common law, in criminal cases, the defendant had not the right to have compulsory process to compel the attendance of witnesses, etc. He had not the right to be heard by counsel, except upon collateral or incidental questions; he had not the right of the writ of habeas corpus; nor did he, indeed, have the right of the benefit of testimony in his favor under the sanction of an oath; all of which is secured to the citizen by our Constitution and are innovations in the practice of the common law. It is our opinion, then, that the Convention intended only to adopt the common law, to use their own language, "as the rule of decision" in criminal proceedings, and no more of the forms and peculiar writs of that code than might be found necessary to carry out the objects contemplated by that adoption. And surely the Convention never intended, when they inserted in the Constitution a provision creating an appellate court in criminal as well as civil cases, to deny the accused who might wish to appeal from the district court to the Supreme Court the right of having the facts of his case, as well as the law, opened to re-examination. We can not believe it. We decide then that the defendant in a criminal prosecution in the district court has the right of

Rogers, 6 T., 91; Fitzhugh v. Orton, 12 T., 4. Set-off must be mutual and due in the same right with the debt sued on. Allbright v. Aldrich, 2 T., 166; Wright v. Treadwell, 14 T., 255; Simpson v. Huston, 14 T., 476; Bullock v. Dunbar, 17 T., 243; McCorkle v. Lawrence, 21 T., 731; Hamilton v. Van Hook, 26 T., 302; Riley v. Runkle, 29 T., 92; Maxey v. Besser, 44 T., 506; Evans v. Bell, 45 T., 553; Masterson v. Goodlett, 46 T., 402; Casey v. Hanrick, 69 T., 44; Pires v. Snodgrass, 91 T., 105; Sheilds v. Stark (T. C. A.), U. R. C., 1899. Not required to be mutual and due in same right, where plaintiff is insolvent or a nonresident. Hanchett v. Gray, 7 T., 549; Castro v. Gentiley, 11 T., 28;

appeal to this court from the judgment or sentence of the court below, and to have the facts as well as the law, at his own election, opened for re-examination.

Having disposed of the preliminary question that the defendant in a criminal prosecution in the district court has the right of appeal from the judgment of that court to the Supreme Court, and shown conclusively, as we believe, that the Constitution has given the Supreme Court jurisdiction by appeal in criminal cases, we will next proceed to inquire whether it was error in the court below, in the case now under consideration, in overruling the motion in arrest of judgment. We will consider this decision of the district judge with an eye both to the law and the facts as shown by the record.

The motion in arrest of judgment was predicated upon the fact that the "dealing of faro, the offense charged in the indictment, was committed before the passage of the act entitled 'An act creating the County of Travis,' and within the then territorial limits of Bastrop County." Numerous authorities were cited by the counsel for the appellant upon the trial of this case in the Supreme Court to show that it was error in the court below to overrule the motion; but we are unable to see their application in this case, and we are satisfied that they do not comprehend this particular case. The motion was bad in arrest of judgment and properly overruled. If the reasoning was good in support of the motion in arrest, it would be equally good under similar circumstances in Bastrop County, because it was once called "Mina;" and in Harris County, because it was formerly called "Harrisburg." The present Congress has passed an act dividing Red River County into Red River, Bowie and Lamar; and this doctrine, if it were correct, would protect from just punishment any offender, however flagrant his offense, if committed before the passage of the act dividing the county, unless the offense should have been committed within the new territorial limits of Red River County. The counsel for the appellant with candor admitted that the appellant could not have been properly indicted and tried in Bastrop, and contended that inasmuch as the act creating the County of Travis contained no special provision for such cases as that of the appellant, that he could not be legally tried and convicted in either county. But what, we will ask, was the intention of the Legislature in passing the act creating the county of Travis? Was it to protect the guilty from punishment? Was it to open the prison doors to them that were bound, without making any compensation to an injured community and the violated laws? Was it to encourage crime, and insult the majesty of

Simpson v. Huston, 14 T., 476; Aycock v. Doty, 1 App. C., sec. 223; Bolton v. Sadler, 1 App. C., sec. 1227; Melvin v. Chancy, 8 T. C. A., 252; Fleming v. Stansell, 13 T. C. A., 558; Neely v. Grayson Co. Bank, 25 T. C. A., 513; El Paso National Bank v. Fuchs (T. C. A.), U. R. C., 1895; Anderson v. Whitehead (T. C. A.), U. R. C., 1901. Unliquidated damages can not be set off or plead in reconvention against a liquidated demand or debt, and vice versa. Rev. Stats., 1895, art. 754; Walcott v. Hendrick, 6 T., 406; Carothers v. Thorp, 21 T., 358; Cato v. Phillips, 28 T., 101; Walker v. Burks, 48 T., 206; Craddock v. Goodwin, 54 T., 578; Parks v. Dial, 56 T., 261; Riddle v. McKinney, 67 T.,

the Constitution? No! It had other motives and other intentions in view. Of this we are certain. And what they intended is binding upon us in expounding the law. And so we decide and affirm the judgment or sentence of the court below with costs, and order that this cause be certified to said court according to law, and that the sentence of said court be executed according to the record.

*Affirmed.*

Judges Hutchinson and Scurry say: "We concur in the result of this opinion; and that result, though attained by the members of the court upon some diversity of reasoning, etc., is to be the law of the case."

Nothing on record to show any further concurrence.

## No. XVII.

### REPUBLIC OF TEXAS v. DAVID LAUGHLIN.

#### (See Note 19.)

*Appeal from Travis County.*

BAYLOR, JUSTICE.—In the District Court of Travis County, David Laughlin was tried on an indictment which charged him with having willfully, corruptly and erroneously taken and and demanded of one J. C. Tannehill a greater fee than is allowed by law for a certain judgment rendered by Laughlin as a justice of the peace for said county, in a civil action wherein one Wm. Y. Wood was plaintiff and said Tannehill was defendant, to-wit, the sum of twenty dollars in the promissory notes of the government; alleging said sum to be more than the fee allowed by law for costs in such cases; contrary to the duty of said Laughlin in his office, as justice aforesaid, and against the laws and statutes in such cases made and provided.

On his plea of not guilty, a verdict was rendered finding him guilty as charged.

Reasons in arrest of judgment were filed, and the district court, without rendering any judgment on the verdict or deciding the motion in arrest of judgment, referred to the Supreme Court for their "consideration and discretion, the matters of law arisng on the various grounds urged in arrest of judgment, as questions difficult and novel."

Before we are permitted to decide the several points made in this case, we feel it to be our duty first to dispose of a preliminary question; and that is, whether the record and proceedings before us make out a proper case for the interposition and decision of this court.

---

29; Howard v. Randolph, 73 T., 454; Rogers v. Watson, 81 T., 400; Taylor v. Bewley, 93 T., 524; Dempsey v. McKennell, 2 T. C. A., 284; Bank v. Kilgore, 17 T. C. A., 462; Santleben v. Froeboese, 17 T. C. A., 626; Taylor v. Bewley, 23 T. C. A., 509; Worley v. Smith, 26 T. C. A., 270; National Guarantee and Loan Co. v. Thomas, 28 T. C. A., 379; Davis v. McDowell, 1 App. C., sec. 380; Couch v. Parker, 1 App. C., sec. 438; Schmidt & Zeigler v. Rost, 1 App.

The Constitution of this Republic in directing the organization of the Supreme Court provides "that it shall have appellate jurisdiction only." Under a similar provision found in the Constitutions of other countries whose institutions and laws are analogous to our own, it has been decided that their supreme courts can not entertain jurisdiction in any case until judgment has been rendered in the court below, or unless it be to do some act in aid of their appellate jurisdiction.

The doctrine thus settled we leave open to future consideration, as it is sufficient for us to decide that nothing final has been done in this case from which an appeal can be taken.

The judge of the district court should have rendered judgment, subject to the opinion of this court, on the points reserved. By section 43 of the act establishing the districts courts, the judge of any district court may at his discretion in any criminal case reserve a question of law, which to him may appear novel and difficult, for the consideration and discretion of the Supreme Court at the next succeeding term, and the Supreme Court shall pronounce such *sentence,* or *judgment,* as the district court ought to have pronounced.

We think that this section of the act does not enlarge the jurisdiction, but that the only construction which can be given to it consistently with the *paramount law* is, that it provides an additional mode of bringing a case of this nature into this court, after judgment shall have been rendered in the court below.

This case having been sent up by the direction of the judge of the inferior court, it is ordered to be remanded to the District Court of Travis County, without costs, for the final action and adjudication of that court.

## No. XVIII.

### SOLOMON C. RICE v. GEO. POWELL

*Appeal from Washington County.*

HUTCHINSON, JUSTICE.—Powell sued Rice in respect of a draft of the auditor in his favor on the Treasurer of the Republic for $330, stating ownership; that it was pledged for a small sum, which had been tendered and the draft as well as its sum demanded but withheld; that Rice was about to leave Texas for the United States, and that therefore Powell, the plaintiff, asked writs of citation and attachment, and judgment for $330, Texas promissory notes, with interest and costs; or such other relief as should consist with law and equity. There was an affi-

C., sec. 684; Le Geirse v. Mathews, 1 App. C., sec. 779; Pittman v. Keith (T. C. A.), U. R. C., 1893; Wilson v. Manning (T. C. A.), U. R. C., 1896; Norwood v. Bank (T. C. A.), U. R. C., 1898; Hansen v. Yturria (T. C. A.), U. R. C., 1898; Presnall v. McLeary (T. C. A.), U. R. C., 1899. Except when the set-off is founded on a cause of action arising out of, or is incident to, or connected with, plaintiff's cause of action. Rev. Stats., 1895, art. 755; Egery v. Power, 5 T., 501; Walcott v. Hendrick, 6 T., 406; Hammons v. Belcher, 10 T., 271;

davit stating that the defendant had informed the plaintiff he was about
to leave the Republic; and the fiat of the district judge, awarding the
writs prayed, on bond being given in half of the sum demanded, with
conditon to pay the damages to be sustained. On the 13th February,
1839, the petition was filed, granted; writs issued, and the attachment
served on a keel-boat and the summons served on the defendant. The
defendant, by way of plea, excepted to the process as illegal, and for that,
and because of the insufficient affidavit and bond, prayed that the suit
and proceedings should be quashed. On March 4, 1840, on his motion,
the attachment was quashed by the court; a jury came, "who being sworn
well and truly to try the issue joined by the parties," found for the
plaintiff $323.75, "in the Treasury notes of the government of the Re-
public of Texas;" and there was judgment for that sum in such notes.
If answer or plea to the merits was filed it is not exemplified; nor is any
of the evidence certified.

Since the mode of civil prosecution according to the common law
is not to be regarded, but that by petition and answer used; and since
we are required to review proceedings in civil causes with an eye solely
to the merits, we are reluctantly obliged to say that the narrative in
the petition contains matters which, if true, amount to a civil inquiry
of some sort. It was plainly correct to quash the attachment, and if
that had been the only process, the suit should have followed that result;
but though it was an abuse to pray and obtain in one and the same suit
in the ordinary form process against the estate and the person, yet as
the defendant was cited personally and appeared and pleaded, the order,
on quashing the illegal writ, should have been, that the defendant have
leave to answer or plead to the merits. It being stated in the postea
that the jury were sworn to try the issue joined, we are left to infer he
did answer or plead in bar; but from the negligence or want of skill in
the clerk, it has not appeared in the transcript. The defendant can not
urge as error the order quashing the attachment; it was on his motion
and for his benefit.

But we can not sustain the verdict or judgment. On the facts stated
in the petition, the plaintiff might have prayed restitution of the draft,
and in that case the jury, on finding him entitled to it, should have so
stated in their verdict, and assessed, in standard money, its value with
the damages occasioned by the detention of the draft, on which the
judgment would have been in the alternative, for the draft, if to be had,
with the damages; and if not to be had, then the price assessed with
those damages. Had specific restoration been a favorite or earnest ob-
ject, and the detention either particularly injurious to the owner or

Castro v. Gentiley, 11 T., 28; Sterrett v. City of Houston, 14 T., 153; Brady v.
Price, 19 T., 285; Bodman v. Harris, 20 T., 31; Ashworth v. Dark, 20 T., 825;
Carothers v. Thorp, 21 T., 358; Duncan v. Magette, 25 T., 245; Coleman v.
Bunce, 37 T., 171; Calhoun v. Pace, 37 T., 454; Beckham v. Hunter, 37 T., 551;
Hoodhue v. Myers, 58 T., 405; Scalf v. Tompkins, 61 T., 476; Satterthwaite v.
Loomis, 81 T., 64; Du Bois v. Rooney, 82 T., 173; Paschal v. Penry, 82 T., 673;
Imperial Co. v. Bank, 5 T. C. A., 686; Brown v. Montgomery, 19 T. C. A., 548;

attended with circumstances of aggravation, the jury might have fixed the value so high as to have insured the restitution. In no way were Texas promissory notes demandable on the draft from the defendant. It was no evidence of his promise, or obligation to pay those notes, but they appeared payable on it at the Treasury. The jury, however, might have treated the suit as in the nature of an action of trover and assessed in damages, in lawful money, the value of the draft and the damages produced by its detention, putting both together into one amount. Their verdict being for Treasury notes, without any ratio or criterion of value formed, a valid judgment could not be rendered on it. A pecuniary judgment or decree can be given alone for a sum or sums in the currency of the Constitution. Congress has no power to require a creditor at large, or by adjudication, to receive in satisfaction any money other than specie, if required; and hence it would be worse than idle to adjudge or decree, and issue process to collect any other medium. It is true that tender may be good, if made in an inferior currency, if not objected to by the creditor; but his constitutional right to have the standard money can not be impaired; nor is it perceived that Congress has attempted it. To require the taxes and debts due to the government to be received in the emitted evidences of its own debt, can in no sense be illegal; and whether it be allowable or not to require ministerial and other offices to receive government notes in payment of salaries and fees, can be decided when the question is directly presented. We need not go into the learning upon the subject of the English jurisprudence on the topics presented in this case in regard to specie and an inferior currency; our Constitution has erected a standard of value which, in all matters of contract and pecuniary liability as among the citizens and in view of adjudication, can never be transcended or disregarded.

No other question has been raised in this case, nor does the record seem to present any other. The judgment must be reversed and the cause remanded. Some of the court have hesitated as to remanding; but a majority concur in that, and all of us agree in the reversal for the reasons given.

This cause coming on to be heard on the transcript of the record and the same being inspected, and the arguments of counsel heard, because it seems to the court here that in the proceedings below there is manifest error, it is therefore considered by the court here that the judgment herein by the District Court of Washington County be reversed and annulled; that the appellant recover of the appellee as well his costs in this behalf in this court expended, as the costs in the court below ex-

---

Howard v. Moore, 1 App. C., sec. 225; Bacon v. Lloyd, 1 App. C., sec. 285; McDonnell v. Bitters Co., 1 App. C., sec. 1160; G. C. & S. F. Ry. Co. v. Tacquard, 3 App. C., sec. 250; Scott v. M. N. Ry. Co., 4 App. C., sec. 287; Streeper v. Thompson (T. C. A.), U. R. C., 1893. Insolvency of plaintiff is no ground for setting off unliquidated damages against liquidated. Walcott v. Hendrick, 6 T., 406; Duncan v. Magette, 25 T., 245; Fondren v. Leake, 1 U. C., 151; Bennett v. Carsner, 1 App. C., sec. 619; Knight v. Old, 2 App. C., sec. 78; Smith v. Bates (T. C. A.), U. R. C., 1894; Presnall v. McLeary (T. C. A.), U. R. C., 1899. Liquidated debts or damages may be set off against liquidated. Sheldon v. Martin, 65 T., 409; Jones v. Hunt, 74 T., 657; June v. Brubaker, 5

pended by him prior to the said judgment; and that this cause be remanded to the said district court, with instructions to allow the appellee to amend his petition if he so desire, and the appellant to plead or answer to the merits; and that a new trial be had.

*Reversed and remanded.*

## No. XIX.

### D. G. & R. MILLS v. EDWIN WALLER.

(See Note 20.)

*Appeal from Brazoria County.*

HEMPHILL, CHIEF JUSTICE.—The appellants commenced their suit in the District Court for the County of Brazoria on the 28th day of February, 1837, against one John Thomas, to recover a debt of $958.22, with interest at 10 per cent from the first day of October, 1836, being the balance due on a note of hand drawn by the said Thomas in favor of the appellants, and dated the 17th day of May, 1835. The petition prayed for a writ of attachment, alleging that the said Thomas was an absentee, and that he owned a tract of about 800 acres of land in the county of Brazoria. The attachment was issued and executed on the day above named on the land described in the petition. On the 4th of March following, a supplementary petition was filed, alleging it had been discovered that the said Thomas had property of a movable nature within the county, and that unless the same were attached they feared the loss of their debt—the land being incumbered with a mortgage belonging to McKinney and Williams. On the second writ of attachment issued, the sheriff made the following return: "Not being able to find the specific property described in that instrument, I thereupon seized and sequestered all the property in this county in the *defendant's brand.*"

At the succeeding term of the court, the curator appointed to represent the interests of the absent defendant put in his answer, disclaiming for the defendant all right, title and interest in the land attached, and that long prior to the levying of said attachment the land had been sold by the said Thomas to one Moses L. Patton. At the said term of the court, Edwin Waller, the appellee, filed his plea of intervention, alleging his ownership of the land attached, and that it was in nowise responsible for the liabilities of Thomas. The appellants put in a general denial of the allegations of the intervener, and at the spring term of the court of 1838, the jury found a verdict in the following terms: "We, the jury, find judgment for Mills against Thomas for $950.22,

---

T. C. A., 79; Bank v. Lynch, 6 T. C. A., 590; Walker v. Fearhake, 22 T. C. A., 61; Bank v. De Morse (T. C. A.), U. R. C., 1894; Snelling v. Koerner (T. C. A.), U. R. C., 1894. Unliquidated against unliquidated. Bodman v. Harris, 20 T., 31; Sanders v. Bridges, 67 T., 93; Taylor v. Bewley, 93 T., 524. But damages arising from separate torts can not be set off against each other. Hart v. Davis, 21 T., 411; Boyd v. Clark, 21 T., 426; Shook v. Peters, 59 T., 393. **Mutual**

with interest at 10 per cent from the 1st of October, 1836, as specified in the note, and that the property attached is not liable for the debt." Judgment was in accordance with the verdict, and we are asked to reverse the same on various grounds.

1. It is alleged to be manifestly erroneous in not condemning the personal property attached as liable to the demand of the appellants. The return of the sheriff to the second writ of attachment is exceedingly indefinite. He does not enumerate the articles of property levied on, nor does he affirm that they are property of the defendant; but that being unable to find the specific property described in the instrument, he had seized on everything in the *defendant's brand*. With this vague return of the sheriff, and in the absence of all proof that the articles attached belonged to the defendant, we are of opinion that the jury was justified in finding that the said property was not liable to the debt of the appellants. But the decision of this question is unnecessary. The appeal bond has been executed in favor of the intervener alone; and our revision of the decision of the court below will not extend beyond the matters in controversy between the said intervener and the appellants.

2. That the sale from Thomas to Patton was void, on several grounds. First, the disparity between the price paid by Patton and the value of the land raises a violent presumption of fraud, which amounts to conviction when it is observed that Patton in his subsequent sale to Waller refuses to warrant against any existing lien. Patton purchased the land from Thomas in the town of Liberty on the 3d of April, 1836, for $1000, and on the 24th day of February, 1837, sold to Edwin Waller, the appellee, for $5500. It appears that the sale from Thomas to Patton took place at a time when the county of Brazoria was invaded by the Mexicans and generally abandoned by its inhabitants. It is stated that the land was proven to be worth $7000. It is to be regretted that facts are not more fully and clearly set forth in statements furnished from the courts below. We are not informed whether this was the value of the land at the period of its sale to Patton, or at the time of the trial— whether it was worth $7000 when the country was occupied by an overwhelming invading army and subjected to all the horrors of war, or in a period of comparative peace and prosperity. To raise the presumption of fraud the disparity must be shown to exist between the consideration paid and the actual value of the thing at the period of sale. We are not informed that this was attempted in this case, and the verdict of the

accounts may be set off against each other. Hall v. Hodge, 2 T., 323; Crook v. McGreal, 3 T., 487; Campbell v. Park, 11 T. C. A., 455. Usurious interest against principal. Huggins v. Citizens Bank, 6 T. C. A., 33. Apparent legal holder of note may plead it in set-off. Thomas v. Young, 5 T., 253. Courts have power to set off mutual judgments against each other, independent of statute. Simpson v. Houston, 14 T., 476; Duncan v. Bullock, 18 T., 541; Dutton v. Mason, 21 T. C. A., 389. Debt due deceased person or his estate may be set off in an action by legal representative, though it has not been presented for allowance. Morton v. Gordon, Dal., 396; Thomas v. Hill, 3 T., 270; Smalley v. Trammell, 11 T., 10; Hall v. Hall, 11 T., 526; Dickenson v. McDermott, 13 T., 248; Mitchell v. Rucker, 22 T., 66; Andrus v. Pettus, 36 T., 108; Alford v. Smith,

jury repelling the presumption of fraud, we are forced to the conclusion that the value proved referred to the time of the trial and not of the sale. From such evidence, the jury were not authorized to infer that the price paid for the land two years previously was so grossly inadequate as to be fraudulent against third parties, and especially when it is recollected that the sale was effected when the county was deserted by its inhabitants, desolated by a powerful invading force, and by many of the best patriots believed to be irretrievably lost.

There is no evidence that Patton had any knowledge at the time of his purchase of the existence of the demand of appellants against Thomas. This must be proven before the alienation to Patton could be set aside as fraudulent. It is not sufficient to establish fraud on the part of the vendor and actual injury to creditors; but a knowledge of the fraud on the part of 'the vendee must also be proven. In Curia, Phillip, Lib. 2, chap. 13, the law on this subject is expressed in the following terms: "Y asi en la enagenacion por titulo oneroso, se requieran tres cosas; fraude de parte del enagenante, y sciencia de el de parte del recibiente, y el evento o suceso del fraude en dano de los acseedores." See also Kenney v. Dow, 10 Martin, 577. Nor is there proof that the insolvency of Thomas was known to or suspected by Patton, or that the creditors of Thomas would be injured or affected by the purchase of the land. The fact that Patton in his sale to Waller refused to warrant against any other claim to the land than his own, does not in our opinion raise the presumption of fraud in the first transaction. Nearly eleven months elapsed between the first and the latter sale. Ample time was afforded Patton to become acquainted with the fact of incumbrances and claims against the premises; and his refusal to give more than a quitclaim title can not be regarded as other than an evidence of a desire on his part to avoid litigation.

But it is said that the sale from Thomas to Patton was an act under private signature; that the law of Louisiana in relation to attachments was then in force in this Republic, and that under that law it has always been decided that an attaching creditor had a preference over a purchaser under private act not recorded; and that therefore the sale to Patton has no force and validity as against the appellants. The decisions referred to were not founded on any provisions of the act regulating attachments; but on various other articles of the code prescribing the effect and operation of sales under private signature as between the parties to the same, and also in relation to third persons. This portion

<hr>

40 T., 77; Traders Bank v. Cresson, 75 T., 298; Chapman v. Brite, 4 T. C. A., 506; Walker v. Fearhake, 22 T. C. A., 61; Collins v. Barbee, 3 App. C., sec. 126. If claim has been approved, can not be used as set-off without showing necessity for equity. Robb v. Smith, 40 T., 89; Floyd v. Rust, 58 T., 503. Executor can not set off damages for harassment and attorney's fees against claim due from estate; nor a debt due the estate by an assignor of a claim due by the estate. Selkirk v. McCormick, 33 T., 136; House v. Collins, 42 T., 486. An heir can not set off a debt due estate with his distributive share. Guthrie v. Guthrie, 17 T., 541. Set-off can not be allowed against State, unless authorized by statute. Borden v. Houston, 2 T., 594; Bates v. Republic, 2 T., 616; Chevallier v. State, 10 T., 315; Dean v. State, 54 T., 313, 314; State v. Snyder, 66 T., 687.

of the laws of Louisiana has never been in force in this Republic; and the decisions thereon can not be regarded as authority. It can not be denied, however, that the provisions of the laws of Spain in relation to private acts are similar to those of Louisiana, and that under both systems it is an established principle of law (though not without several modifications and exceptions) that acts under private signature have no dates as against third parties. The subject is not without its perplexities; but it will be sufficient to discuss and resolve them when they fairly arise in a case before the court. In the present instance it is unnecessary. The objections made to the act of sale is, that it was under private signature, and therefore inoperative against the appellants. Without touching on the subject of conveyances generally, we are of opinion that this was not a private, but an authentic act. It was executed before a notary public, with instrumental and assisting witnesses, and is free from all the objections which could be urged against it as an act under private signature. If it were agreed that this conveyance was effected by the registration law of 1836, yet it was not required to be recorded until long after the commencement of the action. It is, however, clear that the rights of the parties arose under the laws in force at the time of the execution of this instrument; that they are controlled and established by these laws, and not by subsequent acts of legislation.

Upon the consideration of the whole matter, the jury having found in favor of the appellee, and there being no sufficient proof to rebut the presumption always arising that a verdict is correct, we are of opinion that the appeal should be dismissed; and it is hereby ordered and decreed that the same be dismissed, and the judgment of the court below be affirmed.

*Dismissed.*

## No. XX.

### WM. G. HILL v. WM. McDERMOT ET UX.

#### (See Note 21.)

*Appeal from Brazoria County.*

HUTCHINSON, JUSTICE.—On the 9th of September, 1837, the appellees sued the appellant for restoration of the slaves Priscilla and her child Sylvia, or their value with damages and costs. The answer admitted defendant's possession, denied title in the plaintiffs, and averred that the defendant purchased from Edwin Waller, praying that he should be cited as warrantor. Waller answered, impleading Fitchett and Gill, his vendors; and they answered that they purchased from John Chafin, and impleaded his administrator, who in his answer denied the

---

When two are separately liable for the whole debt, it may be set off against either of them. Rust v. Burke, 57 T., 341; Fleming v. Stansell, 13 T. C. A., 558. Creditor of husband can not set off debt of husband against use and

allegations in the petition. There was a verdict for the plaintiffs against the defendant, and verdicts over for the respective vendees against their warrantors; but a new trial was granted. An amended petition was then filed, alleging that Chafin, in 1836, forcibly took from plaintiff Elizabeth, then the widow of Whitfield Sledge, the two slaves, which she believed her property, and of which she was peaceably possessed at the seizure. The answer to this is only a general denial, relying on prescription. On the 23d of March, 1840, there was a verdict finding the slaves to be the property of the plaintiffs, and assessing $900 as their value, and $350 the damages for their services; and a judgment for them for those sums with their costs.

The evidence, so far as certified, was that Sledge and wife emigrated from Georgia to Texas prior to August, 1835, in which month he died; that they brought with them the woman Priscilla, whose child Sylvia was born in Texas, though when born does not appear; that Sledge, on January 13, 1834, at Brazoria, made to John S. D. Byron the deed for Priscilla of that date, to secure $69 at three months; and on April 3, 1834, made a deed to Chafin for the same slave, to secure him on the 1st of January following $342, with 12½ per cent interest, the Byron debt, with 5 per cent per month, and $25 borrowed by Pace; and that in the spring of 1836, Chafin, with force, took both slaves out of the possession of the plaintiff Elizabeth and carried them away. The deponent Tennelli, in his deposition, states that he knew the slaves were the property of the female plaintiff; but also mentions that he never heard Sledge or anyone else say the negro was exclusively her property. The deeds were acts under private signature, but were proved in court at the trial; and there was evidence of the value and hire of the slaves. It is not certified by the judge, nor does it otherwise appear, that these were all the facts proved. The court instructed the jury that the wrongful taking of the slaves could not be ground of damages between the present parties; that if the mortgage to Chafin was valid, or if the property in the negroes belonged to the succession of Sledge, they should find for the defendant; but if they believed from the evidence that the entire property in the slaves, at the taking, was in Sledge's widow, they should find for the plaintiff.

It is correctly contended that this being an action to recover specific property, it was incumbent on the plaintiffs to show title in themselves, and they could not prevail upon the mere want of title in the defendant. The suit involved the absolute right, dominion or ownership in the negresses, the demand being in that right; and to have justified a recovery, there should have been sufficient evidence of the allegation.

hire of wife's separate property. Carr v. Tucker, 42 T., 330. Quaere—Can damages growing out of suit in another State be pleaded in set-off in this State? Wiley v. Trawick, 14 T., 662; Withee v. Fearing, 23 T., 503. An assigned debt may be set off with a debt due from assignor before notice of assignment. Townsend v. Quinan, 47 T., 1; Fry v. Houston, 6 T. C. A., 710; Ellis v. Kerr, 11 T. C. A., 349; Tyler Car and Lumber Co. v. Wettermark, 12 T. C. A., 399; Henderson v. Johnson, 22 T. C. A., 381; McCarty v. Squyers (T. C. A.), U. R. C., 1896. Defendant may plead any set-off acquired before

Any defect in the averment of title was cured by the answers, denying the right claimed. Our chief embarrassment, however, arises on the inquiry, whether the record shows, all things considered, that the jury had evidence or grounds legally sufficient to authorize their verdict for the plaintiffs. We have only what Tennelli, in his deposition, says in regard to the ownership of the plaintiff Elizabeth. If he knew, as he asserted, that the slaves belonged to her, it was immaterial what her former husband or anyone else had declared or had not declared. The question on the trial might have been raised whether such oral testimony of ownership was competent, or whether there was any higher evidence extant and not produced; but nothing of this sort was agitated. If the witness was interrogated as to the circumstances of the acquisition, as for instance, how, when, of whom, where and by what contract, solemnity or process she had become the owner of Priscilla, the evidence thus elicited should have been certified. The judge in his statement of the proof does not attempt the minutia, but gives only what were, in his estimation, results of the proof; or more indefinitely that such and such facts were in evidence. Two juries have found ownership in the plaintiffs; and the party, considering himself aggrieved should have had such a memorial made of the proof as would have satisfied the revising court that the whole, in substance at least, was embodied. Even then we would have been in a condition to consider only, but not weigh it; yet still we should have been better assured of the conclusions we should derive from it. Taking the exhibition of the proof sent up as containing the whole, we are not satisfied with the assumption by the appellant's counsel that there was a failure to prove title in the plaintiffs. We are not to presume that anything was proved but what is certified; but, in favor of two concurring verdicts, we assume as true that there was no evidence of the laws of Georgia concerning the rights of the wife in personal property in the possession of the husband or family; that there was no proof of an administration on the estate of Whitfield Sledge, nor any evidence of there being any heirs of the decedent. But it is insisted that this court knows, as a matter of public national history, that the common law in Georgia regulated the relation of Sledge and wife, and gave to the husband the whole personal estate, in the absence of a legitimate express contract giving the wife a separate property. We are presumed to know what doctrines of the common law pertain to the jurisprudence of Texas; but this presumption does not carry our judicial knowledge beyond the limits of the Republic as to any doctrine

filing plea. Thomas v. Young, 5 T., 253; Parrott v. Underwood, 10 T., 48; Wright v. Treadwell, 14 T., 255; Gaines v. Salmon, 16 T., 311; Lemmon v. Box, 20 T., 329.

Note 14.—Fowler v. Poor, p. 401.
    Attachment proceedings must be commenced by petition or concurrent with same. Wooters v. McGee, 1 T., 17; Cordova v. Priestly, 4 T., 250; Bowers v. Chaney, 21 T., 362; Kennedy v. Morrison, 31 T., 207; Whitemore v. Wilson, 1 U. C., 216; Jones v. Stone, 2 App. C., sec. 358. Petitions not necessary in justice court. Henry v. Blasco, 1 App. C., sec. 765; but citation must issue before or at same time. King v. Robinson, 2 App. C., sec. 555. Is a harsh

or rule of municipal law of any kind in use in a foreign State. Were we bound to know the marital rights of a couple at a given date in Georgia, we should be bound to know those of another, at another date, in the Hebrides, in Hindoostan, in China, or in any island of Oceanica. We are to notice officially the jus gentium; but not the internal or municipal laws of other countries. These last must be proved—written laws by authenticated copies, and unwritten ones by the oral testimony of those skilled in them. In Gale v. Davis' Heirs, 4 Martin, 645, the judge delivering the opinion of the court referred to the laws of North Carolina in regard to the rights of the husband in personalty; and though it is not reported whether or not those laws were proved in that case, yet the doctrine for which it is cited is not ruled. That foreign laws must be proved is an established principle of the common law; and it is equally the rule according to the civil or Spanish law. Boggs v. Reed, 5 Martin, 673; Wakeman v. Marquand, 5 Martin (N. S.), 265.

The laws of the country in which the slave Priscilla was acquired by Sledge, or his wife, if they had been proved on the trial, would have governed in determining the ownership. Contracts made in a foreign country are to be expounded according to the lex loci contractus, whilst the remedies to enforce them are to pursue the lex fori. The maxim, "actor sequitur forum rei," is a part of the law of nations. Morris v. Eves, 11 Martin, 730; Lynch v. Postlethwaite, 8 Id., 69. When, however, the law of the place where the parties contracted or their rights originated is not set forth, the court is to proceed upon the domestic code. Campbell v. Henderson, 3 Martin (N. S.), 152. And where there is a conflict, it being doubtful which system of law should be applied, that of the forum prevails. Saul v. His Creditors, 5 Martin (N. S), 569. Here it is proved only that Sledge and wife emigrated from Georgia to Texas, not that they were married there, not that Priscilla was acquired before or after marriage, nor that the acquisition was in a civil or common law country. How then, upon the data and principles before us, does the question of title in the plaintiffs stand? A witness proves ownership of Priscilla and Sylvia to have been in the female plaintiff, with possession, when Chafin's tortious capture occurred. She was then the widow of W. Sledge, who had died the year previous. Whether he died estate or intestate, or with or without a devisee or heir was not shown—and whether the witness was or was not mistaken as to knowledge of ownership can alone rest on supposition and conjecture. If Sledge died without an heir of any class under the Spanish law; if, too, no one had obtained administration of the succession, in the ab-

---

and summary remedy and all precedent conditions must be strictly complied with. Raquet v. Nixon, Dal., 386; Sloo v. Powell, Dal., 467; Gregg v. York, Dal., 528; Sydnor v. Chambers, Dal., 601; Wooters v. McGee, 1 T., 17; Chevallier v. Williams, 2 T., 239; Caldwell v. Haley, 3 T., 317; Sydnor v. Totman, 6 T., 189; Marshall v. Alley, 25 T., 342; Culbertson v. Cabeen, 29 T., 247; Sheffield v. Gay, 32 T., 225; Moody v. Levy, 58 T., 532; Evans v. Tucker, 59 T., 249; Stiff v. Fisher, 2 T. C. A., 346; Sarrazin v. Hotmann, 16 T. C. A., 351; Ball v. Bennett, 21 T. C. A., 399; Dreiss v. Faust, 1 App. C., sec. 33; Whitley v. Jackson, 1 App. C., sec. 575; Schwartz v. Burton, 1 App. C., sec. 1216;

sence of any proof showing that the husband had had the sole right, was not his widow the sole heir and owner and entitled to sue for restoration? "If no relation exist [such as might inherit] and the deceased leave a legitimate wife, she will inherit the whole of his estate; and we say that the husband will inherit from his wife in like circumstances." 2 Partidas, 1101, 1102.

We may now advert to the defendant's title. It is derived through intermediate vendors from Chafin, who by a violent seizure and asportation obtained possession. Had he title above that of a trespasser? The deeds produced to show his right, in the view of the Spanish law, were instruments of pledge, being of personalty, as contradistinguished from a mortgage which had for its object real estate. By that law the estate pledged, whether real or personal, constituted the chief distinction—the name, prenda, or hipoteca. Either afforded a security for the sum due. In a pledge of the voluntary class, such as that before us, possession of the pledge is not necessary to create the obligation. If the thing pledged had been sold by the pledgor before his delivery of it to the pledgee, the latter was put to his suit against the debtor; and after that he was allowed to sue for the thing pledged. The instrument of pledge might be transferred; but the pledgee might sell the thing, if no day of payment was fixed, on giving the debtor notice. If a day was named, then a judicial order and public auction were required. 1 White's Recopilacion, 139-143. There is therefore no ground on which to presume possession in Chafin; and if there were, the proof given shows the possession to have been in the female plaintiff, and in her family prior to the seizure.

The deeds of pledges, which under the common law would have been mortgages, were deeds under private signature, and took date, that is to say, acquired efficacy, only from the time of being proved on the trial, as against the plaintiffs, unless it had been shown that W. Sledge, the pledgor, was the sole owner at the giving of the pledges; for in the case excepted, the female plaintiff would have been affected as the wife of the pledgor. But it is not necessary to dwell or rely on this consideration. The deeds, especially that to Chafin, attempted on its face to secure 12½ per cent interest per annum and 5 per cent per month, both illegal and usurious exactions, which rendered the pledge to Chafin wholly void. His deed was not such as would have been enforced either in the ordinary mode by judicial suit or by the award of executive process. He acquired no right under the deed because of its turpitude. "Contracts made by such persons (usurers) are null. The usurer for-

Scram v. Duggan, 1 App. C., sec. 1269. No presumption will be indulged to supply defects. City Nat. Bank v. Flippen, 66 T., 610; Focke v. Hardman, 67 T., 173; Perrill v. Kaufman, 72 T., 214; Moore v. First Nat. Bank, 82 T., 537. But literal exactness is not required. Lewis v. Stewart, 62 T., 352.

Note 15.—Cayce v. Curtis, p. 403.
    At common law, the seal is an absolute requisite to the validity of a bond. Sloo v. Powell, Dal., 467. It is unknown to the civil law and not essential to the validity of obligations and other instruments. Cayce v. Curtis,

feits or loses that which he lends on usury and he pays as much more. Being a second time guilty of the offense, he forfeits the half of his property; and the third time, he forfeits the whole." 1 White's Recopilacion, 255; Herman v. Sprigg, 3 Martin (N. S.), 190. And the pledgee, not having and right or valid lien on the slaves, the subsequent vendees could take nothing under their purchases. There was no attempt to make an ostensible legal transfer under the deed by ordinary or executive process. There can be no objection to this rejection of the deed for usury. It is produced by the administrator of Chafin as evidence to sustain a vendee under him; and it bears on its face the taint of its own turpitude.

It is urged lastly, that if the recovery be permitted it will be no bar to a subsequent recovery by the heirs of Whitfield Sledge. To this we answer, that there is no heir disclosed other than the female plaintiff; and if there be any other heir and he shall sue, we are not at present prepared to say that he could prevail, if the recovery in this case should be duly pleaded and shown in bar of the action. It is sufficient, however, to remark that the allowance of such petitio principi might, in any case, defeat the recovery of the apparent owner.

Were we to take a different view of the evidence of ownership in the plaintiffs, we should nevertheless remand the cause; and this we should do in order to afford to a defendant, deriving title from a source that must remain impure, to protect his purchase, as against one whose peaceable possession was violently determined and who has the verdicts of two juries in favor of her ownership.

There being no evidence that Sylvia was born subsequent to the pledge, it is uncertain whether the right attempted to be derived under it included her; but as the judgment below is to be corrected and conformed to the verdict, it is needless to consider this matter.

The judgment ought to have been for the restitution of the negroes.

This cause coming on to be heard on the transcript of the record, and it being inspected, and the arguments of counsel heard, because it seems to the court that there is no error, except that the judgment below ought to have been for the restitution of the slaves, if to be had, with the damages assessed; and if not to be had, then the value and damages assessed; it is therefore considered by the court here that the said William McDermott and Elizabeth, his wife, recover of the defendant William G. Hill the slaves Priscilla and Sylvia, if to be had, with the damages for detention, assessed to $350, and the costs below; and if said slaves can not be had, then that they recover of him $900, the

Dal., 403; Cayce v. Horton, Dal., 405; Sloo v. Powell, Dal., 467; Foster v. Champlin, 29 T., 22. The common law term "bond" has never been adopted in this State and it is not necessary for bonds to have private seals. Foster v. Champlin, 29 T., 22; Courand v. Vollmer, 31 T., 397. Under Act of February 5, 1840 (Gammel's Laws of Texas, vol. 2, p. 327), providing that a scroll should take the place of a seal, provided it be recognized in the body of the instrument by the person making it, the recognition was not required to be in any specific terms. The use of any words in the body from which recognition could be fairly inferred, was sufficient. Flemming v. Powell, 2 T., 225; Eng-

value of the slaves assessed, together with those damages and costs; and it is further considered that the appellees, McDermott and wife, because of this correction of their judgment, do pay to the appellant, Hill, his costs herein in this court expended. Let this decision be certified below to be executed.

*Reformed and affirmed.*

## No. XXI.

### JAMES KNIGHT ET AL. v. GEORGE HUFF, ADMINISTRATOR, ETC.

*Appeal from Austin County.*

SCURRY, JUSTICE.—The petition in this case recites that John Dinsmore, James Cochran, surviving partner of Walter C. White, deceased, and W. D. C. Hall, jointly and severally promised to pay the said George Huff, administrator of Samuel Sawyer, deceased, the sum of $635. The instrument of writing upon which the said action is founded bears date the 15th day of November, 1835. It appears from the facts of this case that said Samuel Sawyer, on the 10th day of November, 1832, promised in writing to pay W. C. White & Co., on demand, the amount which might fall due to the said White & Co. from the estate of Lewis L. Vieder, deceased. It appears that by a settlement made before L. Lassassua, alcalde of the municipality of Austin, on the 10th day of May, 1833, between George B. McKinstry, administrator of the estate of the said Lewis L. Vieder, and the said Walter C. White for himself and company, that the estate of the said Lewis L. Vieder fell in debt to the said Walter C. White & Co. in the sum of $427.10, which determined the nature and amount of the said demand; which said demand was transferred by the said Walter C. White for himself and company to George Huff, administrator of the estate of the said Samuel Sawyer, on the 24th January, 1834.

From the testimony of J. H. Money and J. Benton Johnson, the chief justice and clerk of the county of Austin, it appears that George Huff, administrator of the estate of the said Sawyer, on the 24th day of August, 1838, exhibited his petition, praying that certain papers in possession of the estate of Wm. Barrett Travis, deceased, were material to the administration of the estate of the said Sawyer and in nowise connected with the estate of the said Travis, and among others the obligation of Sawyer of the 10th of November, 1832, which was delivered to Huff, as administrator of the said Sawyer in accordance with the prayer of the said petition.

---

lish v. Helms, 4 T., 228; Read v. Levy, 30 T., 738. The first section of Act of 1840 was restraining, and confined to instruments for conveyance of estates of inheritance or freehold or for a term of more than five years, and the intent to seal was sufficient, if expressed in any part of the instrument not within the purview of this section. English v. Helms, 4 T., 228; Clayton v. Pridgen, 8 T., 308; Conner v. Autrey, 18 T., 427; Muckleroy v. Bethany, 23 T., 163; Muckleroy v. Bethany, 27 T., 551; Richarz v. Wolcken, 34 T., 102. Under Act

From the testimony of Ira R. Lewis it seems that the note on which this action was founded was given by the appellants, White and Hall, at the succession sale of the said Sawyer, deceased (White signing the note for himself, Dinsmore and Cochran), for cattle purchased by the said White and Hall; and Lewis states that when called upon for a settlement of estates between Huff and himself—one as administrator of the estate of Vieder and the other of the estate of Sawyer—that Huff had Vieder's estate charged with the judgment of Walter C. White & Co., "and said that he had paid it with the note given for cattle purchased at the succession sale, before named," and that it was then a claim in his (Huff's) hands as administrator of the estate of Sawyer against Vieder's estate. The verdict of the jury was for the full amount of the note sued upon without interest.

The only question for the court to decide upon is whether the amount recovered against Sawyer as administrator of the said Vieder is a good set-off against the demand of Huff, as administrator. The court is of opinion that it is. The nature of the first obligation to Sawyer is uncertain; but is determined by the settlement made before Lassassua on the 10th of May, 1833. Huff, as administrator of Sawyer, on the 24th of August, 1838, by petition to the chief justice of Austin County and order of the probate court of said county came in possession of the obligation from Sawyer to White and White & Co., of the date of November 10, 1832, and from the testimony of the said Lewis it appears that he had charged the estate of the said Vieder with the identical amount of the said settlement of the 10th of May, 1833, which he said he had paid with the note "given for cattle at the succession sale of Sawyer in November, 1833." This testimony determines the nature of the suit. It is evident that when the purchase of the cattle was made in 1833, and the transfer of the amount due on settlement in May, 1833, in January, 1834, that the intention of the parties was that the amount of the settlement given in favor of White and White & Co. should be deducted from the amount of the note now sued upon, and therefore the court are of opinion that the offset should have been allowed and that there was error in the court below in not allowing the offset, and that judgment be rendered for the appellee for the sum of $207.90, and be taxed with the cost of this appeal.

of 1840, contracts to transfer land certificates and headright claims were not required to be under seal. Randon v. Barton, 4 T., 289; Bledsoe v. Cains, 10 T., 455. It was not necessary for an obligation to pay money, nor its assignment, to be under seal. Durst v. Swift, 11 T., 273; Jones v. Holliday, 11 T., 412; Holman v. Criswell, 13 T., 38. Nor was it necessary for a contract to sell land to be under seal. Miller v. Alexander, 8 T., 36; Holman v. Criswell, 13 T., 38; Fisk v. Miller, 13 T., 224; Eckhart v. Reidel, 16 T., 62; Martin v. Weyman, 26 T., 460; Courand v. Vollmer, 31 T., 397; Wright v. Lancaster, 48 T., 250, 256; Downs v. Porter, 54 T., 59, 64. A deed without seal or scroll was admissible in evidence to show equitable title in vendee, and deed was entitled to record under section 7 of Act of 1840, though not under seal. Miller v. Alexander, 8 T., 36; Saunders v. Hartwell, 61 T., 679, 686; Tom v. Sayers, 64 T., 339; Frost v. Wolf, 77 T., 455. Act of February 3, 1841 (Gammel's Laws of Texas, vol. 2, p. 608), providing that "when a husband and wife have sealed," etc., was not applicable to sales of personal property. Stooks-

## No. XXII.

### Isabella M. Andrews v. Edmund Andrews.

(See Note 22.)

*Appeal from Brazoria County.*

HANSFORD, Justice.—The transcript of the record from the court below (Brazoria) exhibits the following facts: At the fall term of the District Court of Brazoria County, Isabella M. Andrews commenced her suit against her husband, Edmund Andrews, praying to be divorced a vinculo matrimonii, and also praying for alimony pendente lite. That part of the petition of the plaintiff which prays for alimony pendente lite was granted at the said term of the court, and it was ordered, adjudged and decreed by the court that Edmund Andrews, the husband of defendant, pay to the attorney of record of Isabella, the sum of $500, and that on the first day of January, 1840, he pay the further sum, etc., during the pendency of the suit for divorce. The sheriff of Brazoria County made his return upon this order, or decree for alimony pendente lite, on the first day of October, 1840, by which it appears that the defendant refused to pay the several sums as ordered and decreed by the district court, and also refused to point out any property to be sold by the sheriff to be applied in conformity with the order or decree of the court.

At the October term, 1840, of the district court for said county, a motion was made by the counsel of Isabella for an attachment against the body of Edward Andrews for contempt, and to compel the performance of said decree for alimony pendente lite, which motion was overruled and refused, and to this decision the counsel for Isabella Andrews excepted and appealed to this court.

Whether the Supreme Court can entertain jurisdiction of this cause is, we think, the only question presented now for our consideration. As the decree was for alimony pendente lite, and consequently interlocutory, it would be manifestly incongruous and unseemly, to say the least of it, for the Supreme Court to entertain jurisdiction of and adjudicate upon the interlocutory decrees of an inferior court, while the substantive or original action upon which such decree is founded shall still be pending in the court below.

In Metcalf's case, 11 Coke, 38, it was decided that a writ of error would not lie in a judgment quod computet, because it was not a final decision; and it seems to be a rule of law, as well settled as any other rule, that a writ of error will lie only in cases where the judgment is

berry v. Swann, 12 T. C. A., 66, 73. Act of February 2, 1858 (Gammel's Laws of Texas, vol. 4, p. 968), dispensed with the use of seals on all private instruments, except contracts of corporations. This statute with the amendment of April 28, 1873 (Gammel's Laws of Texas, vol. 7, p. 503), constitute Rev. Stats., 1895, art. 4862. Harris v. Cato, 26 T., 338; Wimbish v. Holt, 26 T., 673; Read v. Levy, 30 T., 738; Courand v. Vollmer, 31 T., 397; Bernhard v.

technically ideo consideratum est. Field, a writer of the greatest accuracy and of high celebrity, states the rue in the words of Coke, that there must be a final judgment, or an award in the nature of a judgment, or else a writ of error will not lie. 2 Tidd, 1062. These expressions are broad and it must be admitted are clearly opposed to the idea of a superior court entertaining jurisdiction and trying questions of mere interlocutory proceedings of inferior tribunals. Again, "A writ of error," says Lord Coke, "lieth when a men is grieved by an error in the foundation, proceeding, judgment or execution; but without a judgment, or an award in the nature of a judgment, no writ of error doth lie, for the words of the writ are 'si judicium redditum sit,' and that judgment must be regularly given by judges of record." Coke upon Littleton, p. 288. And we hear Lord Holt thus speak in delivering his opinion in the case of Grenwett v. Burwell, 1 Salkeld: "A writ of error will not lie upon a conviction and imprisonment for contempt." And we hold the converse to be equally true and based upon the soundest logic, that if a writ of error will not lie upon a conviction and imprisonment for contempt, it can not lie for the bare refusal of a court to punish for contempt. This would be too great an absurdity for any man of common understanding to support.

We shall quote but one other authority and then rest this case upon the general principles of the common law to support and confirm our conclusions. Chancellor Kent says: "A writ of error will not lie upon an interlocutory judgment in an action of account, because it is an award, as that an assize should be taken, or a writ of inquiry issued, or a partition be made. It is not a final and definitive judgment in a cause; and error only lies on a judgment in which all the matter in the original cause of action is determined. It would produce infinite vexation to the courts and oppression to suitors, if error lay on any other than final judgment upon the merit of the cause."

The same doctrine in relation to the writ of error applies with equal force to appeals. Under our judicial system, an appeal is a concurrent mode with a writ of error in removing a cause from an inferior to a superior tribunal, a mode pointed out by the Constitution. And it is very certain that the same reasons why a writ of error will not lie, until a final determination of a cause in the court below, apply with equal if not with greater force to an appeal. And our own statute is explicit on this subject. In the third section of the act creating the Supreme Court, we have the following language: "And the said Supreme Court shall have jurisdiction over and hear and determine all manner of pleas,

De Forrest, 36 T., 518; Clayton v. Mooring, 42 T., 182. Under the statute of 1858 and the present law, the following instruments are valid without seal: (a) Appeal bonds. Russell v. McCampbell, 29 T., 31; Read v. Levy, 30 T., 738; Hart v. Kanady, 33 T., 720; Boney v. Waterhouse, 35 T., 178. (b) Attachment bonds. Bernhard v. De Forrest, 36 T., 518 (overruling Read v. Levy, 30 T., 738; Courand v. Vollmer, 31 T., 397; Hart v. Kanady, 33 T., 720); Gasquet v. Collins, 57 T., 340. (c) Certiorari and sequestration bonds. Courand v. Vollmer, 31 T., 397; Clayton v. Mooring, 42 T., 182; Tompkins v. Toland, 46 T., 584. (d) Appointment of substitute trustee. Jacobs v. Mildred, 53 T., 72; Cheveral v. McCormick, 58 T., 440. (e) Official bond of county treasurer

plaints, motions and controversies, civil and criminal, which may be brought before it by appeal, or other legal process, from any other court in this Republic, which may be cognizable in said Supreme Court, according to the Constitution and laws; provided that no appeal shall be granted, nor shall any cause be removed into the Supreme Court, in any manner whatever, until after final judgment or decree in the court below, except in cases expressly provided for by law." The meaning of the proviso in this section surely can not be mistaken, and in the case under consideration the motion was incidental to a decree, which decree was itself pendente lite, or it was incidental to another action. It would create intricate confusion in judicial proceedings and greatly oppress suitors if such a practice were to prevail. Reason forbids it. The whole tenor of the common law is against it, and our statutes forbid it. It is then our opinion that this court can not entertain jurisdiction of this cause, and it is accordingly dismissed.

*Dismissed.*

Judges Hemphill, Scurry, Baylor and Terrell say: "We concur in the result, but not in the entire opinion."

## No. XXIII.

### C. J. O'CONNOR v. A. N. VAN HOMME.

#### (See Note 23.)

*Appeal from Brazoria County.*

TERRELL, JUSTICE.—Van Homme brought his action in the District Court for the County of Brazoria against O'Connor to recover the value of work and labor done and performed by the plaintiff, Van Homme, upon a house built by him for the defendant O'Connor.

The plaintiff declared upon a special agreement and likewise upon a quantum meruit. The case was submitted to a jury, who returned the following verdict: "We the jury in this case find for the plaintiff four hundred and ninety-one dollars." Upon this verdict the court rendered the following judgment: "It is therefore considered by this court, ordered and decreed, that the plaintiff recover of the defendant the sum of four hundred and ninety-one dollars, with interest thereon, at eight per cent per annum, from the thirtieth day of October, 1840, until paid, and the costs of this suit." A motion for new trial was made by defendant's counsel upon the grounds "that the verdict of the jury was contrary to law, contrary to the evidence, and not supported by the contract of the parties." Which motion being overruled by the court, the defendant appealed to this court.

In support of the appeal it is urged that the verdict of the jury was not warranted by the contract sued on, and that it was contrary both to

---

and county scrip. De Wees v. Colorado County, 32 T., 570; Parker County v. Courts, 2 U. C., 398. Written contracts of corporations should be under cor-

the law and the evidence. To determine these points, we must look to the contract or agreement sued on and the testimony given at the trial. By the terms of the contract the plaintiff, Van Homme, bound himself (under a penalty of $500) to perform certain work therein specified upon a house for O'Connor, the defendant—which work he was to complete by the first day of June, 1839. And the defendant, O'Connor, bound himself (under a like penalty) to make to 'the plaintiff a title to the one-half or one-fourth of a league of land, and also to pay the plaintiff $150 in the promissory notes of the government, etc. The statement of facts shows that according to the proof the plaintiff did not complete the work within the time specified in the agreement; he can not therefore recover upon the writtn contract. The verdict of the jury, however, is evidently founded upon the demand of a quantum meruit. We must therefore direct our inquiry to the question whether this finding is supported by the testimony? To authorize an abandonment of the written contract declared upon, and a finding upon a quantum meruit, there must have been some new contract between the parties—some new agreement, either written or verbal between them; or there must have been some default on the part of the defendant which put it out of the plaintiff's power to comply with the written agreement on his part, or excused him from its performance. It is a well settled principle in the law of contracts that if A undertakes to perform certain work for B in a particular manner, or by a specified time, and B, by some act of his, put it out of the power of A to comply with the contract as made, B shall not be permitted to take advantage of his own wrong and force A to a specific performance; but A shall recover the value of his labor. In support of this position, numerous authorities might be cited, if necessary. In Chitty on Contracts, page 169, it is laid down: "If a man declare upon a special agreement, and likewise upon a quantum meruit, and at the trial prove a special agreement, but different from the one laid, he can not recover on either; but if he prove a special agreement, as laid, and the work done, but not pursuant to such agreement, he shall recover upon the quantum meruit, for otherwise he would not be able to recover at all." To the same point see Bul. N. P., 139; 2 Starkie, 95.

In Lirmingdale v. Livingston, 10 Johnson, 36, the Supreme Court of New York say: "It is (in Bul. N. P.) admitted to be now the rule, that if there be a special agreement, and the work be done, but not in accordance with it, the plaintiff may recover upon a quantum meruit," etc. And Lord Mansfield ruled, in Harris v. Oke, "that when the evidence would support a general count (supposing no special agreement

porate seal, but the ancient and technical rule that a corporation could act and speak only by its corporate seal is obsolete with us. Shropshire v. Behrens, 77 T., 275; Gas Co. v. Harber, 1 App. C., sec. 1123. Where an agent makes a contract under seal, without disclosing his agency, the party with whom he contracts can not elect to hold the undisclosed principal upon the contract. This principle is not changed by our statute. Rev. Stats., 1895, art. 4862; Sanger v. Warren, 91 T., 472. A contrary rule seems to be announced in Rutherford v. Montgomery, 14 T. C. A., 319, 323.

laid) the plaintiff may recover upon it, though there be a special agreement laid, whether he attempt to prove it or not." These decisions carry the principle even further than the general propositions which we have laid down above for the government of this case. We will now apply the facts to the principles laid down, and see whether the finding of the jury was contrary to law and contrary to evidence. According to the "statement of facts" contained in the record, the defendant O'Connor was to furnish the lumber for the building of the house. Carman, a witness called by plaintiff, proved that he once heard Van Homme complain that he had not a sufficiency of shingles to cover the house—that at that time there was a great scarcity of lumber, and it was difficult to obtain, etc.; he did not know, however, that there was not a sufficiency to finish that house, etc. Peter Latimer was also examined for the plaintiff, and stated among other things, he had often seen the plaintiff at work on the house referred to by the first witness, both before and after the 1st day of June, 1839. He stated that in the month of June or July, 1839, he heard Van Homme, *on several occasions,* complain to O'Connor that the *necessary lumber* was not furnished to do the work. In June or July, Van Homme called on O'Connor in presence of witness to furnish shingles to cover the house; and witness knew they were wanted for that purpose. There was a great scarcity of lumber in the town at the time the work was going on, etc. There was a good deal of contradictory testimony in the case. Pilkington, a witness called for the defendant, stated that O'Connor did a considerable portion of the work that was done to the house, and that before Van Homme began the work, O'Connor had nearly prepared the frame to be raised; that the materials (with the exception of the rafters) for building the house were prepared and collected nearly twelve months before Van Homme commenced the work; that Van Homme was frequently working for other people, when he had a sufficiency of materials before him, etc.; that he had frequently heard O'Connor request Van Homme to proceed to finish the house, and that Van Homme neglected to do so. That after the 1st of June, O'Connor told Van Homme if he would proceed and finish the house, he would not exact from him the forfeiture; that in August Van Homme said he had not time to work any longer, and left for Austin, etc. E. M. Pease, another witness called on the part of the defendant, sustained Pilkington in the most material statements made by him.

The question then recurs upon this statement of facts: Does the evidence sustain the jury in the verdict they have rendered? That it is variant, and in some degree contradictory, can not be denied. It is

**Note 16.**—Cayce v. Horton and Clements, p. 405.

At common law, the seal is an absolute requisite to the validity of a bond. Cayce v. Curtis, Dal., 403; Sloo v. Powell, Dal., 467. It is unknown to the civil law and not essential to the validity of obligations and other instruments. Cayce v. Curtis, Dal., 403; Cayce v. Horton, Dal., 405; Sloo v. Powell, Dal., 467; Foster v. Champlin, 29 T., 22. The common law term "bond" has never been adopted in this State and it is not necessary for bonds to have private

not for the court to attempt to reconcile these contradictory statements, or to give the preference in point of credibility to one set of witnesses over the other. That is the sole province of the jury—they have exercised that privilege, and it is not for this court to say, in the absence of all grounds for the assertion, that the jury have mistaken the facts or placed a wrong estimate upon the credibility or the legal effect of the testimony. If the jury gave full credence to the testimony of the witnesses Carman and Latimer, they prove the fact conclusively that O'Connor put it out of the power of Van Homme to comply with his contract by failing to furnish the necessary materials to finish the house by the time specified in the agreement. Both those witnesses say, that in the month of June or July (which must have been after the first of June) they heard Van Homme complain of the want of shingles to cover the house. If he had not furnished them some time in the month of June or July, it is conclusive that he had not furnished them before *the first of June;* consequently, it was put out of the power of the plaintiff to comply with the contract by the act of the defendant himself. Therefore the special agreement was no longer subsisting or in force between them, but had been put an end to by the conduct of the defendant himself, in failing to furnish the necessary materials for the building. Consequently the plaintiff had the right to abandon his written contract and rely upon a quantum meruit.

But even if the plaintiff had failed to perform his part of the obligation, the defendant by his subsequent conduct waived all the legal advantages of that failure. If he intended to rely upon a breach of covenant on the part of the plaintiff, it was his duty immediately to have notified the plaintiff of that fact; and not to have suffered him to continue in his employ through the months of June, July and part of August ensuing, which it is in proof he did do; and by the defendant's acquiescence in which, he deprived himself of all the benefits he might have derived from the plaintiff's failure to comply with his part of the contract; and by which he, tacitly at least, created a new obligation upon himself to pay to the plaintiff whatever his labor was reasonably worth.

The jury have said that labor was worth $591. One of the witnesses, a carpenter, too, said it was worth five or six hundred. Under all the circumstances, therefore, we do not think it right to disturb the verdict of the jury, and consequently we affirm the judgment of the court below with costs.

*Affirmed.*

---

seals. Foster v. Champlin, 29 T., 22; Courand v. Vollmer, 31 T., 397. Under Act of February 5, 1840 (Gammel's Laws of Texas, vol. 2, p. 327), providing that a scroll should take the place of a seal, provided it be recognized in the body of the instrument by the person making it, the recognition was not required to be in any specific terms. The use of any words in the body from which recognition could be fairly inferred, was sufficient. Flemming v. Powell, 2 T., 225; English v. Helms, 4 T., 228; Read v. Levy, 30 T., 738. The first section of Act of 1840 was restraining, and confined to instruments for conveyance of estates of inheritance or freehold or for a term of more than

## No. XXIV.

### WM. L. HALL v. T. J. ALLCORN.

(See Note 24.)

*Appeal from Brazoria County.*

HEMPHILL, CHIEF JUSTICE.—This was an action brought by the appellee on a note of hand of which the following is a copy: "$2260. On or before the twenty-sixth of February next, 1838, we promise to pay Thomas J. Allcorn, administrator of the succession of Elijah Caple, deceased, or bearer, two thousand two hundred and sixty dollars, in good current bank notes, being the amount of property purchased by Andrew Robinson, at the sale of the effects of the said estate, on the 26th of August, in conformity with a decree of the honorable judge of probate in and for the county of Harrisburg. (Signed) A. Robinson, Jr., Wm. Barrett, T. J. Hall, Wm. Sims Hall. Live Oak District, September 6, 1837."

Judgment was rendered against the defendants, *"and each of them, jointly and severally, for the sum of two thousand two hundred and sixty dollars,"* or the entire amount of the note sued on. An appeal has been taken therefrom, and we are asked to reverse the same on the ground that the note on which the suit is brought is an obligation by which each one who bound himself was bound only for his equal portion thereof and the judgment is rendered against them, jointly and severally, each one for the whole.

At the period of the execution of this note the laws of Spain were the common law of this country and afforded the rule by which this contract must be regulated. The question then arises whether this would be considered under that system of laws as a joint obligation or one in solido. For all the purposes of this cause it will be sufficient to define a joint obligation (under the laws which formerly governed the country) to be one where several persons join in one contract to do the same thing; and an obligation in solido to be one where several persons obligate themselves by the term in solido, or other expressions which clearly show that they intend that each one shall be bound to perform the whole of the obligation. The laws of Louisiana are analogous to those of our own system on this subject, and the decisions of their tribunals may justly be regarded as entitled to high consideration.

It is an established principle in both systems that solidarity is never

---

five years, and the intent to seal was sufficient, if expressed in any part of the instrument not within the purview of this section. English v. Helms, 4 T., 228; Clayton v. Pridgen, 8 T., 308; Conner v. Autrey, 18 T., 427; Muckleroy v. Bethany, 23 T., 163; Muckleroy v. Bethany, 27 T., 551; Richarz v. Wolcken, 34 T., 102. Under Act of 1840, contracts to transfer land certificates and headright claims, were not required to be under seal. Randon v. Barton, 4 T., 289; Bledsoe v. Cains, 10 T., 455. It was not necessary for an obligation to pay money, nor its assignment, to be under seal. Durst v. Swift, 11 T., 273; Jones v. Holliday, 11 T., 412; Holman v. Criswell, 13 T., 38. Nor was it

to be presumed. See 12 Martin, 316. And it is equally well established that the words in a note or obligation, "we promise," make a joint obligation and not one in solido. See Mayor and Alderman v. Ripley, 5 La., 122; 3 La., 596, 597. The rule of law in relation to obligations of this description is expressed by a Spanish authority in the following terms: "Where two persons are bound simply or severally (simplemente), each is considered only bound for the half, unless it shall be expressed that they have bound themselves in solidum, and each separately; for then each may be sued for the whole. See 1 White's Recopilacion, p. 152.

On consideration of the same principles of law, and the authorities referred to, it is manifest that the judgment of the court below is erroneous. Instead of being in solido, or against each of the defendants separately for the whole amount of the note, it should have been entered for his respective share thereof.

It is therefore ordered and decreed that the judgment of the court below be reversed and set aside; and this court proceeding to render the judgment which should have been entered by the court below, it is ordered and decreed by this court that the plaintiff recover of each of the said defendants his respective and equal share of the said obligation, with interest on the said portion as the law directs, and the appellant recover his costs expended in this court.

*Reversed and rendered.*

## No. XXV.

### H. Austin v. W. C. White & Co.

#### (See Note 25.)

*Appeal from Brazoria County.*

HUTCHINSON, JUSTICE.—Austin filed his petition or bill against White & Co., alleging that on May 4, 1840, they recovered in the court below, against him, $410.09, with costs; that execution thereon issued; that Austin designated to the sheriff 500 acres of land worth $2 per acre, and 1000 acres of land more, to be taken in execution according to the Act of January 26, 1839, section 4; that the sheriff thereupon illegally levied also on 3328 acres more, not designated; that he advertised the whole for sale on twenty-nine days' notice, which notice was of the 9th of June; that the obligation was made in view of a sale on thirty days' notice according to that act; that nevertheless the sheriff was about to proceed under the Act of February 5, 1840, allowing a sale on twenty days' notice, contrary to the Constitution; wherefore, the bill prays an injunc-

---

necessary for a contract to sell land to be under seal. Miller v. Alexander, 8 T., 36; Holman v. Criswell, 13 T., 38; Fisk v. Miller, 13 T., 224; Eckhart v. Reidel, 16 T., 62; Martin v. Weyman, 26 T., 460; Courand v. Vollmer, 31 T., 397; Wright v. Lancaster, 48 T., 250, 256; Downs v. Porter, 54 T., 59, 64. A deed without seal or scroll was admissible in evidence to show equitable title in vendee, and deed was entitled to record under section 7 of Act of 1840.

tion, etc. The injunction was granted; but at October term, 1840, the court dissolved the injunction and decreed the costs against the plaintiff.

This decree was in effect definite. Whether the subject matter of complaint was cognizable in chancery, or on the contrary was more properly the object of the action of the court in the common form by supersedeas, whereby the court might not only correct errors in its final process, but control illegal or oppressive proceedings of its sheriff, need not be here decided; for taking the matter to be cognizable in equity, it is not sufficient to justify an injunction. It was competent for Congress to alter the remedy, as was done by the Act of 1840, prescribing twenty instead of thirty days' notice for an execution sale. The clause in the Constitution referred to in the bill is in no degree invaded or violated. The laws of the land existing at the date of a contract do not enter into the contract so as to form portion and essence of it, but will be the criterion to define its scope and obligation. Its obligation is to do, or forbear, according to the engagement or stipulation. The remedy to redress a breach of it in force at its date may be altered or modified according to the will of the Legislature, so that a full remedy of some sort be provided. This doctrine is so well established as to render a reference to authority superfluous.

The bill only intimates a step *toward* oppression in the officer—an excessive levy on lands—and the relief sought is to limit him to a less quantity. We can not now know that the officer at the sale would have contravened the law. The law and his oath to observe it require him to sell each tract separately until satisfaction is obtained; and we can not anticipate that he would have violated those sanctions.

This cause coming on to be heard on the transcript of the record herein in the District Court of Brazoria, and it being inspected, because it seems to the court here that there is no error in the decree below, it is therefore considered by the court here that the same be affirmed; and that the appellees recover of the appellant their costs in this court expended.

*Affirmed.*

## No. XXVI.

### WARREN D. C. HALL v. JAMES A. E. PHELPS.

(See Note 26.)

*Appeal from Brazoria County.*

HUTCHINSON, JUSTICE.—On the 23d July, 1838, Phelps instituted suit against Hall. In his petition, it as alleged that on the 16th August, 1824, a grant issued to him from the Mexican government for a league of land called the Orozimbo league, on the west bank of the

though not under seal. Miller v. Alexander, 8 T., 36; Saunders v. Hartwell, 61 T., 679, 686; Tom v. Sayers, 64 T., 339; Frost v. Wolf, 77 T., 455. Act of February 3, 1841 (Gammel's Laws of Texas, vol. 2, p. 608), providing that "when a husband and his wife have sealed," etc., was not applicable to sales of personal property. Stooksberry v. Swann, 12 T. C. A., 66, 73. Act of Feb-

Brazos, being number 3 above the league of Martin Varner; that thereon he erected a dwelling, tenements and improvements, occupying it with his family, composed of himself, a wife, children and slaves, and cultivating the same until August, 1831—having in all things performed the conditions of the grant to him as a colonist; that on the 13th of that month, being himself absent with his wife on a visit to a child in the United States, having left his slaves and his overseer in full possession, Hall, with violence and without any right or authority, expelled the overseer and the slaves from the dwelling and tenements they occupied, driving them to some distant huts on the land; and about the 6th of the November following he in like manner drove them wholly from the land, putting out of the inclosures the household furniture, etc., leaving the same to be wasted and destroyed, and took entire possession of the dwelling, tenements and premises, and continued with force to occupy until March following; that meantime Phelps returned, sought restoration of his estate, but it was withheld until after an agreement was extorted from him to convey 1000 acres on the lower part of the league, in consideration of being restored to possession of the residue—and also a conveyance of the 1000 acres accordingly. Such is an outline of the prolonged injury, which is circumstantially stated in the petition. It is averred that owing to the distracted condition of the country in regard to the administration of justice, and the revolution that intervened, the suit had been delayed. General damages for the tortious consumption, injury and destruction of personal property and the provender of the crop of 1832, are demanded; and it is prayed that the deed for the 1000 acres may be brought in and canceled and plaintiff quieted, etc.

On the 18th of March, 1840, Hall answered, demurring to the petition for multiplicity of demands, etc., denying generally the injuries charged, and stating in regard to the conveyance: "He denies having used force or violence to compel or induce the plaintiff to execute the deed which is prayed to be canceled; on the contrary he alleges that the said deed was made and executed for a good and valid consideration." And it concludes with the plea of prescription. The answer was not verified.

The cause was tried and heard on the —— day of October, 1840. A jury found that the defendant entered on the premises of the plaintiff without any title in law or warrant of authority from the plaintiff; that the plaintiff, with a view to be restored to possession, gave up one portion of his land to get possession of the other portion, and that the title of the plaintiff was genuine. On the trial, the defendant's counsel

ruary 2, 1858 (Gammel's Laws of Texas, vol. 4, p. 968), dispensed with the use of seals on all private instruments, except contracts of corporations. This statute, with the amendment of April 28, 1873 (Gammel's Laws of Texas, vol. 7, p. 503), constitute Rev. Stats., 1895, art. 4862. Harris v. Cato, 26 T., 338; Wimbish v. Holt, 26 T., 673; Read v. Levy, 30 T., 738; Courand v. Vollmer, 31 T., 397; Bernhard v. De Forrest, 36 T., 518; Clayton v. Mooring, 42 T., 182. Under the statute of 1858 and the present law, the following instruments are valid without seal: (a) Appeal bonds. Russell v. McCampbell, 29 T., 31; Read v. Levy, 30 T., 738; Hart v. Kanady, 33 T., 720; Boney v. Waterhouse, 35 T., 178. (b) Attachment bonds. Bernhard v. De Forrest, 36 T., 518 (overruling Read v. Levy, 30 T., 738; Courand v. Vollmer, 31 T., 397;

moved that the jury should be instructed: 1. If they believed the parties compromised their difficulties and settled the same, they should find for the defendant. 2. If they believed the deed to defendant was made without force or threats, they should find for the defendant as to the deed. 3. If they believed that after the alleged force, etc., the parties settled their matters and lived together amicably, they should find for the defendant. 4. Even if force were used at first, still if the plaintiff, when not under its influence, complied with his contract, he could not recover back the thing sold or given. These the court refused to give, but charged the jury, if they believed the defendant entered on the premises without any title in law or warrant of authority from the plaintiff, and that he, with a view to be restored to possession, gave up one portion of his land to get back the other, they might declare the title so made as void; that they should determine from the evidence, if this had been such a case; that if they believed the defendant had a doubtful claim to the league granted to plaintiff, they might find for the defendant; but to come to that conclusion they should be satisfied the defendant had more than a shadow of title; and that if they believed the defendant's entry on the land was without any right to enter, they might find such damages as the evidence warranted. The court after the verdict proceeded to make a decree. After giving in that decree a summary of the proofs and evidence, it was adjudged that the deed for 1000 acres be null and void, and be delivered by the defendant to the sheriff of Brazoria County, to be brought into court and canceled; that the defendant should be enjoined from ever disturbing the plaintiff in his possession of the league of land, and that the plaintiff recover his costs.

The evidence, whether documentary or ore tenus, is moreover spread on the transcript, and because it so fully sustains the petition, verdict and decree, it would be useless to quote it, but we will proceed at once to notice the grounds for reversal urged by the appellant's counsel.

1. It is contended that the deed of January 12, 1832, prayed to be canceled, should have been produced, or its absence accounted for, as a basis for proof of its contents; there being no proof to show the consideration of the deed. This position is untenable. The chief object of the suit was to nullify the deed as an instrument illegally extorted from the plaintiff and as being in the hands of the defendant, liable to be used by him injuriously to the plaintiff, who so far from needing it as a memorial of any right he claimed, reprobated it as inherently vicious and cast himself upon the court to protect him against it. Had it been

Hart v. Kanady, 33 T., 720); Gasquet v. Collins, 57 T., 340. (c) Certiorari and sequestration bonds. Courand v. Vollmer, 31 T., 397; Clayton v. Mooring, 42 T., 182; Tompkins v. Toland, 46 T., 584. (d) Appointment of substitute trustee. Jacobs v. Mildred, 53 T., 72; Cheveral v. McCormick, 58 T., 440. (e) Official bond of county treasurer and county scrip. De Wees v. Colorado County, 32 T., 570; Parker County v. Courts, 2 U. C., 398. Written contracts of corporations should be under corporate seal, but the ancient and technical rule that a corporation could act and speak only by its corporate seal is obsolete with us. Shropshire v. Behrens, 77 T., 275; Gas Co. v. Harber, 1 App. C., sec. 1123. Where an agent makes a contract under seal, without disclosing his agency, the party with whom he contracts can not elect to hold

useful to him as evidence, he would have been required to have notified the adverse party to produce it. The title sought to be protected by it was assailed by the petition; and if the paper contained anything favorable to the defendant, he could have used it as defensive proof. Its existence, and the land on which it was expected to operate, were alike admitted in the answer; and by that answer the question was raised, if it was for a good or valid consideration. Now what was the consideration of that deed? The answer is that it was a good and valid one; but what sort of consideration is not intimated. Let it be repeated that the defendant did not afford to the answer the verification of an oath. He had not such temerity. We are to look into the volume of proof sent up to find why, on what cause, that deed was made. We are not left to *presume* that the verdict was correct. Hall, availing of the temporary absence of Phelps and his wife on a visit to their child, in the spirit and with the hand of rapacity, took possession of the domicile and soil which the unsuspecting and confiding Phelps had acquired by the enterprise and privations of years and trusted would be kept inviolate to receive him on his return. Let it not be imagined that we will descend into the detail of the continued outrage inflicted. It will be enough to remark that he, in his own audacious words, *reigned sole possessor* of the usurped manor and premises, affecting all the power and vaunted hospitality of a successful marauder of the dark ages, until the deed was signed and delivered, and thereafter, until it pleased him to depart! He invited Phelps to the board and the hearth he had taken from him in his absence and with strong hand—a possession he declared he would retain at the cost of life and upon his own principles. He did retain it, until what is called a compromise of a doubtful right was extorted. The deed was given by the oppressed Phelps solely as an expedient, and the only available one, apart from superior force, in the then condition of the country, whereby to find on his own dominion a shelter for himself and family. We are not to decide according to the nerves or tears of a party; but we may be allowed to say that chivalry and outrage have never been regarded as affiliated. The agreement and bond of December 27, 1831, and the pretended deed of January 12, 1832, were alike extorted. The usurpation continued until in March following. We are reluctant to assert any principle containing the boundaries within which a transaction, in its incipiency tortious or void, may be validated by a subsequent deliberate act of the victim; for whenever the law sets up its definitions, the craft and cupidity of man too soon become prepared to fill up the picture, so as

---

the undisclosed principal upon the contract. This principle is not changed by our statute. Rev. Stats., 1895, art. 4862; Sanger v. Warren, 91 T., 472. A contrary rule seems to be announced in Rutherford v. Montgomery, 14 T. C. A., 319, 323.

**Note 17.**—Ex parte Colin De Bland, p. 406.

Quo warranto is a legal proceeding by the State to determine the right of an office or franchise, and to oust or forfeit. As a general rule, it can only be sued out in the name of the State by its prosecuting officer. It is also used to ascertain whether an individual has authority to exercise official functions. Ex parte Colin De Bland, Dal., 406; Bradley v. McCrabb, Dal.,

to escape its penalties   It is sufficient in this case, after rendering due acknowledgment of the zeal and talent exhibited in the argument, to declare that what is primarily flagitious can only be cured by voluntary or adjudicated recompense.   In manifold instances, what is begun properly but afterwards turned into enormity, or covin, becomes vicious from the beginning.   The oppression here was one consisting of a series of trespasses and extending beyond the procurement of the conveyance.   It was not so urged, but yet we consider Phelps as being harassed, pressed and overcome; not indeed by manual force, but still by a force equally lawless and more to be reprehended because of its effrontery and long continuance.   It was whilst he was under this duress that the conveyance originated.   Between the mockery of the agreement in which Hall pretended to relinquish his right—as if he had any to relinquish!—and the deed, where was the time or place to Phelps to repent or retract?   At no moment was he free to do so, for the incubus remained.   We feel bound by a solemn sense of duty to admonish the communities of this Republic to discountenance by every peaceable and lawful means the repetition of such conduct, and to be at least assured that if it be re-enacted and brought into the judicial tribunals, it will be visited with the utmost measure of retributive and corrective justice.

2.   It has been urged that the court below erred in charging the jury in this, that there might have been, according to the evidence, a compromise of a doubtful right, and the instructions were calculated to prevent a proper verdict on that ground.   We have examined the evidence in vain to collect any such state of fact, as would have justified any reference by the court in its instructions in regard to the rule as to such a compromise.   The charges refused, when connected with those given to the jury, were well calculated to fix the minds of the jury upon any and every possible ground of defense to the defendant.   The court did, in effect, instruct them to find for him if they believed the deed grew out of such a compromise, provided it was on something more than a mere shadow of right on the part of Hall; and this we esteem as having been more in his favor than the court, from the evidence, was bound to give.   It is true, as established by the books, that a compromise of a doubtful right will be sustained if the parties act on a full knowledge of the facts, for it is upon the doubt as to the right that they act, and the law favors what prevents litigation.   This principle is in perfect harmony with the interesting doctrine that an injured party, whose loss or injury arises out of his act or agreement made when he was ignorant of his rights or mistook

504; Wright v. Allen, 2 T., 158; State v. S. P. Ry. Co., 24 T., 80; Gram. v. Chambers, 34 T., 573; Brennan v. Weatherford, 53 T., 330; State v. De Gress, 53 T., 387; Farmer v. State, 69 T., 561; Wallace v. Anderson, 5 Wheat., 291; Territory v. Lockwood, 3 Wall., 236.   An individual may make the relation on which the State's officer files the information.   In such cases the proceedings are in the exclusive control of the State's officer, and can not be dismissed by the relator.   Banton v. Wilson, 4 T., 400; Mathews v. State, 82 T., 577; McClesky v. State, 4 T. C. A., 322.   If relator has no interest, court may refuse to allow the information to be filed, or dismiss it.   Deaver v. State, 27 T. C. A., 453.   Can not be used as a remedy by a stockholder of a corporation. State v. R. G. Ry., 41 T., 217.   Quo warranto is a proper proceeding to try

the law, may allege that ignorance or mistake as a ground of relief—if the adverse party can not in conscience retain the advantage he has gained—and if, too, the error or ignorance can be shown clearly by proof aliunde. The late Chancellor Kent and a few others have contravened this doctrine; but it stands supported by the current of the most celebrated jurists and judges. It does not, however, appear that there was in the transaction before us, any misapprehension of rights or of the laws; but on the contrary, its remarkable feature is a most willful and deliberate violation of the laws on the part of the defendant, and a full appreciation of the wrong by the plaintiff.

The ground on which the appellee's counsel has treated the conveyance as invalid may be applied. If one receive from another a price for abstaining from the commission of an act which he was bound by law not to commit, he will be compelled to restore the price; or if he had only received a promise, then to release the obligor from it; it being esteemed very base to receive a price for doing what the law compelled him to do. 2 Partidas, 941; 2 Pothier, 28. This is sound morals; and the common law, though not to be the rule of decision in this case, holds the same principle for the conveyance has no shadow of a valid consideration to support it. If here Phelps had acted in ignorance of the law that bound Hall to restore the premises, and had acted under the name and solemnity even of a compromise, equity, which is derived from the civil law and the fountains of universal justice, would have relieved him. 2 Story's Equity, 134.

3. Prescription is invoked to shield the defendant. The deed was procured on the 12th January, 1832, and the suit instituted on the 23d July, 1838, a period of more than six years. The conveyance was only an evidence or muniment of title to a part of the immovable Orozimbo league, and the suit is as well to cancel that as to be quieted in the possession of the whole league. It is therefore more analogous to the action to try titles than any other; and indeed the defendant's title is directly put into controversy, so that the limitation of ten, instead of four or three years, seems most applicable. But under what system of jurisprudence will a court, when proceeding upon the principles of equity, apply to an equitable demand the limitations of legal remedies, stricti juris? Statutes, or laws of prescription or limitation, are adopted in chancery by way of analogy, but yet under such rules and restrictions as that court deems compatible with equity, and hence in transaction of express trust, in such as originated in fraud and much more in those growing out of oppression, the bar is not allowed to intervene. It would be interesting to notice more in detail the civil and English chancery law upon these subjects,

---

title to an office, but it has always been regarded by our courts as only a cumulative remedy. Bradley v. McCrabb, Dal., 504; Wright v. Allen, 2 T., 158; State v. Cooke, 54 T., 482; Flatan v. State, 56 T., 93; Watts v. State, 61 T., 184; State v. Jennett, 63 T., 261; McAllen v. Rhodes, 65 T., 348; Fowler v. State, 68 T., 30; Williams v. State, 69 T., 368; Livingston v. State, 70 T., 393; State v. De Gress, 72 T., 242; Hunnicut v. State, 75 T., 233. The term "franchise" used in Act of July 9, 1879 (Gammel's Laws of Texas, vol. 9, p. 75), Rev. Stats., 1895, art. 4347, regulating quo warranto proceedings, applies

and the accordance of both system upon them; but it is not called for. The court considers it indispensable to notice the districted state of Texas from 1832 to 1835, and the revolution that occurred, as raising a sufficient ground to prevent the bar here invoked.

4.   The last position is that conveyance was promised, and even if that promise had been made through force or fear, it was afterward performed, and so the conveyance will be supported. This would have been correct, if at the conveyance Phelps had acted not only in full knowledge of the facts and of his rights, and had been perfectly free to do or not to do what he did; but the record does not present him in that disenthralled position.

This cause coming to be heard on the transcript of the record herein in the District Court of Brazoria, and it being inspected and the arguments of counsel heard, because it seems to the court that there is no error, it is therefore ordered and decreed by the court here, that the decree of the court below be in all things affirmed; that the appellee recover of the appellant the costs by him in this behalf in this court expended, and that this affirmance be certified below for execution.

*Affirmed.*

## No. XXVII.

### McKINNEY & WILLIAMS v. T. C. BRADBURY, ADMINISTRATOR.

(See Note 27.)

*Appeal from Brazoria County.*

HANSFORD, JUSTICE.—This action was commenced in the District Court of Brazoria by the appellees—"trading together as merchants and partners, under the firm and style of Cole & Cogley," on an account stated, for the sum of $6414.75 against "McKinney and Williams, merchants and partners," of the same county, "trading under the firm and style of McKinney & Williams." The petition, which is in the usual form, with the account annexed, concludes with a prayer "for debt, interest, cost and damages." The answer denies all and singular the allegations of the petitioners and prays judgment for costs; and for further answer alleges that the petitioners were indebted to them in the sum of $6506.39 by account exhibited, and "prays judgment for the same with interest and costs." Upon the issue joined, a trial was had at the fall term of the District Court for Brazoria County, and judgment rendered

---

only to franchises of corporations. State v. Smith, 55 T., 447; I. & G. N. Ry. v State, 75 T., 356. County and district attorneys can not institute quo warranto proceedings to forfeit charter of corporation. Rev. Stats., 1895, art. 4343, in so far as it attempts to confer such power, is unconstitutional. Such proceedings must be brought by the Attorney-General. Constitution, art. 4, sec. 22; State v. Paris Ry., 55 T., 76; State v. Moore, 57 T., 307; State v. I. & G. N. Ry., 89 T., 562; also see State v. S. P. Ry., 24 T., 80; State v. R. G. Ry., 41 T., 217. A contrary rule seems to be held in Morris v. State, 62 T., 728, but it is distinguishable from the other cases, in that the suit was to oust from use of a franchise not authorized by law—may be filed by district attor-

against McKinney & Williams for $4217.87, from which they appealed. There was also a motion in the court below to set aside the verdict and for a new trial, on the following grounds: 1. That the jury misconceived the evidence. 2. There was a mistake in the rendition of the verdict. 3. The verdict was contrary to law and evidence. 4. The defendants were surprised by the testimony relative to the order, or paper, spoken of by one of the witnesses. This last ground was supported by affidavit. The motion after argument was overruled and a new trial refused.

The statement of facts—as agreed on by the parties and certified by the judge—recites, that the appellants admitted the account of the plaintiff, and the appellee admitted the account of the defendants, except $3500 charged by the defendants against the plaintiffs for charter of steamboat Laura. The witness Welsh stated that the boat of McKinney & Williams, the Laura, was chartered by Cogley, one of the firm of Cole & Cogley, to go from Quintana to the mouth of the Sabine river. That after making the charter, Cogley gave an order, or draft on paper, for the amount of the charter, leaving the amount indefinite, and instructing them to furnish the defendants from time to time with what they might want, and that such articles as were demanded by defendants were furnished by Cole & Cogley. The witness was clerk for defendants, but did not know for what purpose the boat was chartered, or whether it was for the benefit of Cole & Cogley or not. There was no direct proof that the contract of charter was a partnership transaction. The court charged the jury that if they believed that the charter was a partnership transaction they would allow the offset.

The court very properly ruled that common report was inadmissible to be given in evidence in the issue joined, and with equal propriety rejected proof of the contents of a written instrument, without its loss, or its possession by the adversary, being first legally established.

The charge of the judge was evidently too general and too indefinite. It embraced a mixed question of law and fact. In civil cases, the law is properly confided to the court and the facts to the jury. To the legal abilities and the discriminating judgment of the court has been wisely committed the more difficult task of expounding the law to the jury; and to the judgment of twelve honest men, however unlearned, that of finding the facts and applying the law, under the charge of the court, to the facts thus found. It is when each are confined within the limits of its respective sphere as established by the Constitution and

ney pro tem. Fowler v. State, 68 T., 30; Davis v. State, 75 T., 420; Little v. State, 75 T., 616; Bell v. Faulkner, 84 T., 187, 189; Dean v. State, 88 T., 290; State v. Thompson, 10 T. C. A., 272; Hanscom v. State, 10 T. C. A., 638; Hussey v. Heim, 17 T. C. A., 153; Gray v. State, 19 T. C. A., 521; Quintanilla v. State, 23 T. C. A., 479. Though the State may appeal without bond, the costs should be taxed against the relator, not the State. Hussey v. Heim, 17 T. C. A., 153; State v. Broach (T. C. A.), U. R. C., 1896. It does not lie when there is no question as to the right to the office, to question right of officer to do an act or restrain him from exercising a privilege incident to his office. State v. Smith, 55 T., 447. Nor to oust an officer for bribery until conviction. State v. Humphries, 74 T., 466. Nor to revise decision of city

(442)

laws, and in strict conformity also with the great landmarks of that science which has been justly called the perfection of "human reason," and the maxims and rules of which constitute the most stupendous fabric of intellectual grandeur ever reared by the mind of man, that the boasted trial by jury can be properly appreciated. The court should have charged the jury what constituted, in law, a partnership, and then left the jury to find the facts and apply those facts to the law. Is it to be expected that the yeomanry of the country, who must always constitute our juries, can decide what acts of one member of a firm are binding in law upon that firm? This would indeed be requiring of twelve men, uneducated in the first principles of the law, to decide upon questions in one of the most difficult branches of the most difficult science that has ever occupied the cogitations of the human understanding. And although we can not say, in the language of the defendants' motion for a new trial, "that the jury misconstrued the evidence," we will say, that having been improperly employed in the function that belonged alone to the court—that of deciding what act in law of one partner was binding upon all—they "misconceived" the law, as they must generally do whenever the task of expounding it is committed to such unskilful hands. It was error then in the court below to so charge the jury, and the result was a verdict contrary to law and evidence.

Now let it be admitted for the sake of argument that Cogley chartered the steamer Laura for his own individual use and on his own private account; it is an allegation that could only properly be made by the plaintiffs, and on them and not upon the defendants rested the onus probandi. By a well settled rule of practice, as old as the law itself, the party making an averment must show that the allegata and the probata must correspond. And even in that case it would not be sufficient, if the transaction was of a character fairly within the range of the commercial transactions of the firm, unless a knowledge of the fact is brought home to the defendants by proof, and that they extended to Cogley the credit upon his own individual capacity. And supposing too that it was a private transaction of this character (and it is a supposition at war with the whole tenor of admissions of the parties and the evidence in the cause), yet subsequent to that transaction and in liquidation of the debt which had accrued upon the charter of the Laura, we find the firm of Cole & Cogley furnishing the defendants, in the language of the witness Welsh, "what things they wanted from time to time;" thus recognizing by their acts, and ratifying by their compliance with the stipulations of Cogley, the debt which had accrued upon the contract of charter, as a debt due by the firm. It is true that the articles

council as to eligibility of candidate for municipal office. Seay v. Hunt, 55 T., 545; Krakauer v. Kaples, 5 T. C. A., 264. Nor by public weigher against a private weigher. Watts v. State, 61 T., 184. It does not lie to forfeit franchise, except for causes declared by statute. State v. R. G. Ry., 41 T., 217; Morris & Cummings v. State, 65 T., 53. It lies against the enjoyment of a franchise granted either by State or municipal legislation, when the power to grant did not exist; and the legality of the corporation may be called in

thus furnished the defendants from time to time are attempted to be placed to account of the defendants as a running account with reference to the charter party; yet we think the plaintiffs in this attempt have wholly failed.

But although we have admitted for the sake of argument that Cogley chartered the boat for his own use and on his individual credit, we do not believe that he did. We can not believe it in the absence of all testimony. And the rule of law is, that "if the partnership is admitted, the act of each of the partners, in transactions relating to the partnership, is considered the act of all and binds all. The act of one of the partners, though on his private account and contrary to the private arrangement among themselves, will bind all parties, if made without knowledge in the other party of the arrangement and in a matter which, according to the usual course of dealing, has reference to the business transacted by the firm." Kent's Com., p. 41; Hope v. Cust, 1 East, 53; Swan v. Steele, 7 East, 210; Le Roy, Bayard & Co. v. Johnson, 2 Pet., 186.

The books abound with numerous and subtle distinctions on the subject of the extent of the power of one partner to bind the company, and we shall not attempt to do more than select the leading rules and give a general analysis of the case upon this point. If a bill or note be drawn by one partner in his own name only and upon the firm of which he is a partner, on partnership account, the act of drawing has been held to amount, in judge of law, to an acceptance of the bill by the drawer in behalf of the firm, and to bind the firm, as an accepted bill. And even if the paper was made in a case which in its nature was not a partnership transaction, yet it will bind the firm, if it was made in the name of the firm, and there be evidence that it was done under its express or implied sanction. Kent's Com., p. 41; Vesey, p. 602.

It is no matter with what fraudulent views goods are purchased by one partner, or to what purposes he may apply them, it is binding on the firm if the seller be clear of the imputation of collusion. 3 Kent, p. 45. In the case of Doty v. Bates it was held, upon good authority too, that the partnership being admitted, the presumption of law is that a note made by one partner in the name of the firm, in the regular course of partnership dealings, is for the benefit of all the parties and binding on the firm until the contrary be shown. 11 Johns., 546. There is no question as to the rule that if a person take a partnership security from one of the partners, for what is known at the time to be a particular

question by quo warranto in an action involving the right of an officer to do an act under the charter. Morris & Cummings v. State, 62 T., 728; State v. Goowin, 69 T., 55; Furrh v. State, 6 T. C. A., 221. It lies to test validity of a municipal or quasi municipal incorporation. State v. Dunson, 71 T., 65; East Dallas v. State, 73 T., 370; State v. Eidson, 76 T., 302; Ewing v. State, 81 T., 172; Mathews v. State, 82 T., 577; State v. Wofford, 90 T., 514. In such cases laches can not be imputed to the State. State v. Wofford, 90 T., 514; Troutman v. McClesky, 7 T. C. A., 561. It is not a means to compel a person or corporation to carry out contracts. It is used to forfeit, not to suspend a franchise; to reclaim a privilege, not to punish for breach of con-

